**Susan J. CARTER, Personal Representative of the Estate of Adam C. Jacobs, and Susan J. Carter, Individually, Appellants–Plaintiffs,**

v.

**INDIANAPOLIS POWER & LIGHT COMPANY, Marion County Commissioners, County of Marion, State of Indiana, Honda Motor Company, American Honda Motor Company, Inc., Honda of America Manufacturing, Inc., Indiana Bell Telephone Company, Inc., Ameritech and Ameritech Indiana, Appellees–Defendants.**

No. 49A02–0502–CV–90.

Court of Appeals of Indiana.

Nov. 10, 2005.

Rehearing Denied Jan. 11, 2006.

John R. Helm, Schreckengast, Helm & Cueller, Indianapolis, IN, Attorney for Appellants.

1. For the sake of convenience, we refer to Carter in the singular throughout this opinion.

Philip Linnemeier, Indianapolis, IN, Attorney for Appellee Indianapolis Power & Light Company.

Lakshmi Hasanadka, Office of Corporation Counsel, Indianapolis, IN, Attorney for Appellees Marion County Commissioners and Marion County.

Wayne C. Turner, Kenneth J. Munson, Carl A. Hayes, McTurnan & Turner, Indianapolis, IN, Attorneys for Appellee Indiana Bell Telephone Company, Inc.

## OPINION

CRONE, Judge.

### Case Summary

Susan J. Carter, individually and as personal representative of the estate of her son, Adam C. Jacobs,[1] appeals the trial court's grant of summary judgment in favor of Indianapolis Power & Light Company ("IPL"), Indiana Bell Telephone Company, Inc. ("Indiana Bell")[2] (collectively, "the Utilities"), Marion County Commissioners, and County of Marion, State of Indiana (collectively, "the County"). We affirm.

### Issues

Carter presents six issues, which we consolidate and restate as follows:

I. Whether Carter has waived review of her contention that the trial court improperly granted the Utilities' motion to strike certain portions of her designated evidence;

II. Whether the trial court erred in granting summary judgment in favor of the Utilities; and

2. Indiana Bell is also known as Ameritech and Ameritech Indiana.

III. Whether the trial court erred in granting summary judgment in favor of the County.

### Facts and Procedural History [3]

The relevant facts most favorable to Carter, the non-moving party, indicate that on the afternoon of June 18, 1999, seventeen-year-old Jacobs and his seventeen-year-old friend, David Messer, made the acquaintance of seventeen-year-old waitress Sarah Mitchell at a pizza restaurant in Indianapolis. Jacobs and Messer returned to the restaurant when Mitchell's shift ended at midnight, and the trio went to Messer's home.

At approximately 2:30 a.m., Mitchell drove Jacobs and Messer toward a restaurant on Emerson Avenue in her Honda Accord. Mitchell drove north on Franklin Road and turned west on Edgewood Avenue, a straight two-lane thoroughfare with a speed limit of forty miles per hour. Jacobs was in the front seat, and Messer was in the back seat. None of the teens wore seatbelts. Jacobs suggested that they "jump the hills" on Edgewood Avenue, which he had done at least twenty times before. Appellant's App. at 143, 159.[4] Mitchell accelerated to approximately sixty miles per hour and jumped several hills.

She then accelerated to approximately eighty miles per hour before jumping "the big hill" near the intersection of Edgewood and Emerson Avenues. *Id.* at 143. Messer fastened his seatbelt. The car crested the hill, went airborne for a considerable distance, and landed in the middle of the road. Mitchell lost control of the car and oversteered to the right. The car sideswiped an Indiana Bell utility pole and spun clockwise several times. The car then slammed broadside into an IPL utility pole and caught fire. Messer escaped from the wreckage but was unable to rescue the unconscious Mitchell and Jacobs, both of whom died.[5]

Carter reached a settlement with Mitchell's representative. On June 19, 2001, Carter filed an amended wrongful death complaint against the Utilities, the County, and several Honda defendants.[6] Carter alleged, *inter alia*, that the Utilities had "negligently placed, installed, and maintained" the utility poles.[7] The Indiana Bell pole (also known as "pole 65") was originally installed in 1978 and was replaced in June 1998 after being struck by an unknown vehicle. *Id.* at 553, 588. The center of pole 65 was located approximately fifteen inches south of the northern boundary of Edgewood Avenue's twenty-

---

**3.** We heard oral argument in this case on October 11, 2005. We thank counsel for their helpful presentations.

**4.** In his deposition, Messer acknowledged that "some of those times" Jacobs was driving the car. Appellant's App. at 159. In her deposition, Carter stated that Jacobs did not have a driver's license, did not drive, and had not driven on Edgewood Avenue that she was "aware of[.]" *Id.* at 423. We note, however, that Messer testified that Jacobs lived with him during the year prior to the accident. *Id.* at 135.

**5.** An autopsy revealed traces of cocaine and THC in Mitchell's body. There is no evidence that Jacobs or Messer knew that Mitchell had

ingested these substances or that Mitchell's driving was impaired as a result thereof.

**6.** The trial court granted summary judgment in favor of the Honda defendants in 2003. Carter did not appeal that ruling.

**7.** In his deposition, Messer testified that the poles were located "[a] foot at the most" from the edge of the roadway. Appellant's App. at 453. In an affidavit designated by Carter in response to the Utilities' summary judgment motion, civil engineer Roger Park stated that in June 2002 he "determined that the utility poles [in that area] were between thirty inches and forty three inches from the edge of the roadway[.]" *Id.* at 640.

five-foot right-of-way as indicated by the Index of Roads (1822–1879) in the Marion County Surveyor's Office. *Id.* at 203.[8] The IPL pole (also known as "pole 66") was installed in August 1998, and its center was located approximately four inches to the north of the right-of-way, i.e., on private property. *Id.* at 345, 203. Carter also alleged that the County had "negligently maintained, constructed, designed, and signed the section of roadway upon which the aforementioned accident occurred." *Id.* at 106.

On September 3, 2004, the Utilities and the County filed two separate motions for summary judgment. The Utilities asserted that they were entitled to summary judgment on the issues of duty, breach, and proximate cause. The County asserted that it was entitled to summary judgment on the issues of duty, proximate cause, contributory negligence, and assumption of risk. On December 3, 2004, Carter filed a brief in opposition and designated evidence in support thereof. On December 28, 2004, the Utilities filed a motion to strike certain evidence designated by Carter. On January 3, 2005, Carter filed a response thereto. After a hearing on that date, the trial court granted the Utilities' motion to strike in part and denied it in part. The next day, the trial court held a hearing on the motions for summary judgment. On January 7, 2005, the trial court granted both motions. Carter now appeals.

## Discussion and Decision

Our standard of review of a summary judgment ruling is well settled: summary judgment is appropriate "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C).

> Relying on specifically designated evidence, the moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. If the moving party meets these two requirements, the burden shifts to the nonmovant to set forth specifically designated facts showing that there is a genuine issue for trial. A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed material facts are capable of

---

**8.** Carter relies on the Official Thoroughfare Plan for Marion County in asserting that Edgewood Avenue's right-of-way is fifty feet. Appellant's Br. at 16. The trial court disregarded that document pursuant to the Utilities' motion to strike. Carter also asserts that Indiana Code Section 8–20–1–15 "declares that county highway right-of-way may not be less than twenty (20) feet on each side of the centerline." *Id.* The Utilities point out that the statute applies to the design of new roads. *See* Ind.Code § 8–20–1–15 ("A county highway right-of-way *may not be laid out* that is less then twenty (20) feet on each side of the centerline....") (emphasis added). The designated evidence indicates that Edgewood Avenue was laid out in the middle of the nineteenth century, long before the current version of the statute was enacted. *Compare* Ind.Code § 8–20–1–15 *with* 1905 Ind. Acts 167 § 15 ("All highways heretofore laid out according to law, or used as such for twenty years or more, shall continue as located and as of their original width, respectively, until changed according to law; and hereafter no highway shall be laid out less than thirty feet wide, and the order for the laying out of the same shall specify the width thereof.") *and* 1852 Ind. Acts 48 § 39 ("No county road shall be less than thirty feet wide, and no township road shall be less than twenty-five feet wide; and the order for laying out any highway shall specify the width thereof."). In any case, the only competent evidence in the record establishes that Edgewood Avenue's right-of-way is twenty-five feet.

supporting conflicting inferences on such an issue.

*Ross v. Ind. State Bd. of Nursing,* 790 N.E.2d 110, 115 (Ind.Ct.App.2003) (citations omitted).

> Upon appeal, we are bound by the same standard as the trial court. We consider only those facts which were designated to the trial court at the summary judgment stage. We do not reweigh the evidence, but instead liberally construe the designated evidentiary material in the light most favorable to the non-moving party to determine whether there is a genuine issue of material fact.

*St. Joseph County Police Dep't v. Shumaker,* 812 N.E.2d 1143, 1145 (Ind.Ct.App. 2004), *trans. denied* (2005).

A trial court's grant of summary judgment is clothed with a presumption of validity, and the appellant bears the burden of demonstrating that the trial court erred. *Rogier v. Am. Testing & Eng'g Corp.,* 734 N.E.2d 606, 613 (Ind.Ct.App. 2000), *trans. denied* (2001). "Nevertheless, we must carefully assess the trial court's decision to ensure the nonmovant was not improperly denied [her] day in court." *Id.* "If the trial court's grant of summary judgment can be sustained on any theory or basis in the record, we must affirm." *Ryan v. Brown,* 827 N.E.2d 112, 117 (Ind.Ct.App.2005) (citation and quotation marks omitted).

### I. Motion to Strike

■ Carter asserts that the trial court improperly granted the Utilities' motion to strike certain evidence that she designated in opposition to their motion for summary judgment, namely, her affidavit; the deposition testimony of her daughter, Kimberlee Jacobs; a portion of the affidavit of neighborhood resident James Black; and the Official Thoroughfare Plan for Marion County.[9] We remind Carter's counsel that an appellant's argument "must include for each issue a concise statement of the applicable standard of review[.]" Ind. Appellate Rule 46(A)(8)(b). We further observe that "[e]ach contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on[.]" Ind. Appellate Rule 46(A)(8)(a). Aside from a passing reference to Indiana Evidence Rule 803(20), Carter's argument is bereft of citations to authority or to the three-volume, 750–page appendix in which the disputed evidence appears. "A party generally waives any issue for which it fails to develop a cogent argument or support with adequate citation to authority and portions of the record." *Romine v. Gagle,* 782 N.E.2d 369, 386 (Ind.Ct.App. 2003), *trans. denied.* We find that Carter has waived review of this issue.

### II. Summary Judgment for the Utilities

■ In *Patterson v. Seavoy,* 822 N.E.2d 206 (Ind.Ct.App.2005), we explained that [t]o recover in negligence, the plaintiff must establish: (1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff; (2) a failure on the part of the defendant to conform his conduct to the requisite standard of care; and (3) an injury to the plaintiff

---

9. The Utilities objected to hearsay statements in Carter's affidavit and Kimberlee's deposition regarding the allegedly dangerous condition of Edgewood Avenue and the occurrence of other accidents in the area. The Utilities objected to Black's statements regarding other accidents on Edgewood Avenue based on a lack of foundation as to the dates, location, and causation thereof. Finally, the Utilities objected to the Thoroughfare Plan based in part on its disclaimer that it "is intended for planning purposes only and is not a legal description." Appellant's App. at 702 (quoting Plan at 15).

proximately caused by the breach. Absent a duty, there can be no breach and, therefore, no recovery in negligence. Generally, the court decides as a matter of law whether a duty exists. However, at times the fact finder must determine a preliminary factual issue, the existence of which will lead the trial court to determine the legal issue of whether a duty of care arises. In such cases, the determination of the existence of a duty becomes a mixed question of law and fact, which the fact finder ultimately resolves.

*Id.* at 211–12 (citations omitted). "The duty, when found to exist, is the duty to exercise reasonable care under the circumstances. The duty never changes. However, the standard of conduct required to measure up to that duty varies depending upon the particular circumstances." *Stump v. Ind. Equip. Co.,* 601 N.E.2d 398, 402 (Ind.Ct.App.1992), *trans. denied* (1993).

■ Carter contends that the Utilities "owe a duty to the motoring public to exercise reasonable care when placing utility poles along the roadway." Appellant's Br. at 26 (citing, *inter alia, Goldsberry v. Grubbs,* 672 N.E.2d 475 (Ind.Ct. App.1996), *trans. denied* (1999)).[10] In *Goldsberry,* the plaintiff was an intoxicated passenger in a vehicle whose intoxicated driver fell asleep, ran off the highway, traveled down an embankment, and collided with a telephone pole. The trial court granted summary judgment in favor of the telephone company. The *Goldsberry* majority employed the analysis formulated by our supreme court in *Webb v. Jarvis,* 575 N.E.2d 992 (Ind.1991), to determine whether the telephone company owed a duty to the plaintiff. The *Webb* analysis involves the balancing of three factors: "1) the relationship between the parties; 2) the reasonable foreseeability of harm to the person injured; and 3) public policy concerns." *Goldsberry,* 672 N.E.2d at 478 (citing *Webb,* 575 N.E.2d at 995).

In discussing the foreseeability component of the duty analysis, the *Goldsberry* majority reasoned that

[b]y logical deduction, [it] must be something different than the foreseeability component of proximate cause. More precisely, it must be a lesser inquiry; if it was the same or a higher inquiry it would eviscerate the proximate cause element of negligence altogether. If one were required to meet the same or a higher burden of proving foreseeability with respect to duty, then it would be unnecessary to prove foreseeability a second time with respect to proximate cause. Additionally, proximate cause is normally a factual question for the jury, while duty is usually a legal question for the court. As a result, the foreseeability component of proximate cause requires an evaluation of the facts of the actual occurrence, while the foreseeability component of duty requires a more general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence.

*Id.* at 479 (citations and footnote omitted). The majority then concluded that "regard-

---

**10.** Although Carter alleged in her complaint and asserts in her statement of facts that the Utilities were negligent in their installation and maintenance of the poles, she addresses only the placement of the poles in the argument section of her brief. We therefore find that Carter has waived any argument as to installation and maintenance. *See Snowball* *Corp. v. Pope,* 580 N.E.2d 733, 734 n. 1 (Ind. Ct.App.1991) (stating that where appellant in adverse possession case had mentioned statutory tax payment requirement in statement of facts but presented no argument thereon in argument section of brief, "no issues regarding tax payment are before us for review.").

less of the facts that actually occur, it is foreseeable that motorists (or their occupants) will leave the traveled portion of a road and strike utility poles set and maintained along that road. Thus, the foreseeability factor weighs in favor of imposing a duty." *Id.* at 480. Likewise, based on *State v. Cornelius,* 637 N.E.2d 195 (Ind.Ct. App.1994), *trans. denied,*[11] the *Goldsberry* majority determined that the utility had a relationship with the plaintiff, "who was a member of the public traveling along [the] road, which was sufficient to warrant imposing a duty in the present case." *Goldsberry,* 672 N.E.2d at 480. Finally, the majority concluded:

Public policy is not offended by imposing a duty on telephone companies who place fixed objects along the roadway. Such objects pose a danger of harm to members of the traveling public who leave the traveled portion of the roadway. Requiring a telephone company to act reasonably and prudently when placing [its] poles so as not to make such harm unreasonable, is consistent with principles of public policy.

Based on the foregoing, we hold that a telephone company is held to a duty to the motoring public to exercise reason-

able care when placing telephone poles along Indiana highways.
*Id.*

In response to the dissent's argument that imposing such a duty on the telephone company "would be tantamount to imposing absolute liability on all utilities for car/utility pole accidents," the *Goldsberry* majority noted that "duty is but one of three elements that must exist before liability is imposed" and that "[t]he fact that a duty is imposed does not necessarily mean that the utility company will be liable because the breach of the duty and proximate cause of the injury resulting from such breach must also be established." *Id.* at 480–81. The majority further noted that "the duty issue was the sole theory [the telephone company] raised in the trial court" and determined that under Indiana's summary judgment standard it would be inappropriate to grant summary judgment on different grounds. *Id.* at 481. Consequently, the *Goldsberry* majority reversed the trial court's grant of summary judgment in favor of the telephone company.

Carter claims that *Goldsberry* and *Cornelius* are "good law and have not been reversed or distinguished." Appellant's Br. at 26.[12] The Utilities reply that *Golds-*

11. In *Cornelius,* a motorist turning onto a state highway struck the rear end of the plaintiff's motorcycle, causing it to slide into an IPL utility pole on an island in a corner of the intersection. The trial court denied IPL's motion for summary judgment. On appeal, the *Cornelius* court employed the *Webb* duty analysis and determined:

The jury could conclude that it is foreseeable that collisions will occur in an intersection and that one of the motor vehicles will leave the traveled portion of the highway. Given the proximity of the pole to the intersection, the jury could likewise conclude that it is foreseeable that the motor vehicle could strike the pole.

*Cornelius,* 637 N.E.2d at 199. The court further determined that a prior version of Indiana Code Section 8–20–1–28 (discussed

more fully herein) "evidences a relationship between the utility erecting poles along the highway and the public which uses the roads. [The plaintiff] was clearly a user of the road. Thus, we have no difficulty concluding that·a relationship exists on which a duty could be premised." *Id.* The court found a genuine issue of material fact as to the existence of a duty and proximate cause with respect to IPL and affirmed the denial of its motion for summary judgment. *Id.* at 202.

12. Carter also cites to *Copeland v. Public Service Company of Indiana,* 123 Ind.App. 345, 108 N.E.2d 273 (1952), *trans. denied* (1953). In *Copeland,* the plaintiff allegedly lost control of his vehicle "without any fault on his part" and ran onto the shoulder of the road. *Id.* at 348, 108 N.E.2d at 275. As he was steering

*berry*'s foreseeability analysis "has been rejected by the Indiana Supreme Court and subsequent panels of this Court." Utilities' Br. at 15 n. 9 (citing, *inter alia, Estate of Heck v. Stoffer*, 786 N.E.2d 265 (Ind.2003)). In *Heck*, our supreme court evaluated the facts of that particular case in determining that the parents of a fugitive "had a duty to exercise reasonable and ordinary care in the storage and safekeeping of their handgun[,]" which the fugitive took from their home and used to kill a police officer. *Estate of Heck*, 786 N.E.2d at 270. In so doing, the *Heck* court stated: "We decline to take a narrow view of [*Webb*'s] foreseeability of harm prong and determine that this factor weighs in favor of the establishment of a duty." *Id.* at 269.[13] Several panels of this Court have interpreted this statement as an indication that, at the very least, *Goldsberry*'s foreseeability analysis has been "call[ed] into question" by our supreme court. *Lane v. St. Joseph's Reg'l Med. Ctr.*, 817 N.E.2d 266, 271 n. 4 (Ind.Ct.App.2004); *see also Glotzbach v. Froman*, 827 N.E.2d 105, 110 n. 2 (Ind.Ct.App.2005) ("Therefore, we may consider specific facts when addressing foreseeability under duty."), *trans.*

*pending; Nance v. Holy Cross Counseling Group*, 804 N.E.2d 768, 772 n. 1 (Ind.Ct.App.2004) ("In light of *Heck*, we consider specific facts when addressing foreseeability under duty."), *trans. denied.*

The Utilities also cite other authorities that appear to conflict with *Goldsberry*, specifically Indiana Code Section 8–20–1–28; *NIPSCO v. Sell*, 597 N.E.2d 329 (Ind. Ct.App.1992), *trans. denied* (1993); and *Bush v. NIPSCO*, 685 N.E.2d 174 (Ind.Ct.App.1997), *trans. denied* (1999). Our supreme court has explained that "the three-part balancing test articulated in *Webb*, is a useful tool in determining whether a duty exists, but only in those instances where the element of duty has not already been declared or otherwise articulated." *NIPSCO v. Sharp*, 790 N.E.2d 462, 465 (Ind.2003). The Utilities assert that the legislature articulated their duty to locate poles in Indiana Code Section 8–20–1–28, which provides in relevant part:

Public and municipally owned utilities are authorized to construct, operate, and maintain their poles, facilities, appliances, and fixtures upon, along, under, and across any of the public roads, high-

---

back onto the road, he struck a utility pole that was awaiting installation and lying on the shoulder "within two or three feet of [the] pavement." *Id.* Relying on a predecessor of Indiana Code Section 8–20–1–28, which provided that utility poles " 'shall be erected and maintained in such manner as not to incommode the public in the use of [public roads and highways],' " the *Copeland* court determined that the facts alleged in the plaintiff's complaint were "sufficient to present a question of fact as to whether appellees violated" the statute. *Id.* at 351–52, 108 N.E.2d at 276 (quoting Ind.Code § 36–1705 (Burns 1949)) (emphasis removed). The court further stated that the complaint "alleged facts from which the injuries alleged to have been sustained by [the plaintiff] could reasonably have been foreseeable by [the defendants]." *Id.* at 354, 108 N.E.2d at 278. Consequently, the *Copeland* court reversed the judgment in favor of

the defendants and remanded for further proceedings.

13. Indeed, the *Webb* court itself had stated:

Imposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm. *Thus, part of the inquiry into the existence of a duty is concerned with exactly the same factors as is the inquiry into proximate cause.* Both seek to find what consequences of the challenged conduct should have been foreseen *by the actor who engaged in it.* We examine what forces and human conduct should have appeared likely to come on the scene, and we weigh the dangers likely to flow from the challenged conduct in light of these forces and conduct.

*Webb*, 575 N.E.2d at 997 (emphases added, citations omitted).

ways, and waters outside of municipalities, *as long as they do not interfere with the ordinary and normal public use of the roadway,* as defined in IC 9–13–2–157. However, the utility shall review its plans with the county executive before locating the pole, facility, appliance, or fixture.

(Emphasis added.[14]) Indiana Code Section 9–13–2–157 defines "roadway" as "that part of a highway improved, designed, or ordinarily used for vehicular travel." The Utilities seize upon the italicized portion of Section 8–20–1–28 and assert that the three teenagers "were, at Jacobs' urging, deliberately misusing the road by jumping hills at extremely high speed[,]" which caused them to leave the roadway and strike the utility poles. Utilities' Br. at 11–12. Thus, the Utilities argue, they owed Jacobs no duty under the statute.

Alternatively, the Utilities contend that even under a *Webb* analysis, a balancing of the relevant factors would preclude the imposition of a duty, as happened in both *Sell* and *Bush.* The plaintiff in *Sell* was the passenger of a driver who fell asleep and lost control of the vehicle, which crossed the highway's center line, went down an embankment, and hit a NIPSCO utility pole more than thirteen feet from the edge of the highway. The trial court denied NIPSCO's motion for summary judgment. Referring to the previous version of Indiana Code Section 8–20–1–28, the *Sell* court acknowledged that there was "somewhat of a statutory relationship" between NIPSCO and Sell as "a member of the public" using the highway but determined that "this relationship is limited to those members of the public using state highways as they were intended to be used." *Sell,* 597 N.E.2d at 332. The court stated that once the vehicle in which Sell was riding crossed the center line, "the use was no longer legitimate." *Sell,* 597 N.E.2d at 332 (citing Ind.Code § 9–21–8–2, requiring that vehicles be driven on right half of roadway).

As for the reasonable foreseeability of harm, the *Sell* court stated that "[i]n locating and installing the utility pole NIPSCO was required to anticipate the ordinary and usual use of the highway." *Id.* The court stated that NIPSCO was not required to anticipate that a driver would fall asleep and drive down the embankment. Also, the court distinguished a Louisiana case [15] in which the plaintiffs had presented evidence that the pole was located only eight inches from the street near a ninety-degree curve in the road, "that the utility company had notice of prior accidents at that location, and that the utility was aware of an alternative, less dangerous location for its pole." *Id.* at 333. The court stated that had Sell "been able to produce similar evidence in this case, summary judgment would have been inappropriate." *Id.* "Although in some cases it would be reasonably foreseeable that motorists (or their occupants) would leave the traveled portion of a road and strike a utility pole, there are no facts in the present case susceptible of that inference." *Id.* at 334.

Finally, as for public policy concerns, the *Sell* court noted that NIPSCO's pole could not have been relocated "more than

---

14. Prior to 1988, the relevant portion of the statute provided that utility "posts" were to be "erected and maintained in such manner as not to incommode the public use of" roads and highways. *See* 1988 Ind. Acts 86 § 181 (amending Ind.Code § 8–20–1–28). The events in *Copeland, Cornelius, Sell,* and *Golds-* *berry* occurred before 1988, and those courts therefore relied on the earlier version of the statute.

15. *Vigreaux v. La. Dep't of Transp. & Dev.,* 535 So.2d 518 (La.Ct.App.1989).

seven inches further from the highway without the pole being at least partially on private property." *Id.* The court concluded: "To hold NIPSCO to a duty in this situation would be to impose absolute liability upon utilities for such accidents, for there are undoubtedly thousands of poles similarly situated in this state. We are not prepared to say that a utility is the insurer of all persons injured by utility poles that otherwise pose no unreasonable risk of harm." *Id.* Finding no genuine issue of material fact, the court determined that "NIPSCO was entitled to summary judgment as a matter of law." *Id.*

In *Bush,* which was decided after both *Sell* and *Goldsberry,* the plaintiff was a passenger of a driver who sped through an S-curve and lost control of the car, which left the road and hit a utility pole approximately four and one-half feet from the road, one and one-half feet from the edge of the right-of-way, "and approximately 200 feet past the end of the S-curve." *Bush,* 685 N.E.2d at 176. The trial court granted summary judgment in favor of NIPSCO. In applying the *Webb* duty analysis, the *Bush* majority relied on *Sell* to conclude that NIPSCO did not have a legally cognizable relationship with the plaintiff because the driver "was speeding and driving recklessly which is not the normal use of the road." *Id.* at 177. The majority also stated, "While it is foreseeable in the general sense that motorists might leave the road and strike a utility pole, Bush presented no evidence to show that it is foreseeable that a motorist would leave the road and strike this particular pole." *Id.* at 178. The *Bush* court did not even address the public policy prong of the *Webb* analysis before concluding that "no duty existed and summary judgment in favor of NIPSCO was proper." *Id.*[16]

■ Having reviewed the applicable legal authority cited by the parties, we believe that the Utilities' duty was properly articulated in *Goldsberry:* namely, that utility companies owe a duty to the motoring public to exercise reasonable care in placing utility poles along Indiana's public roads and highways. *See Goldsberry,* 672 N.E.2d at 480. We believe that Indiana Code Section 8–20–1–28 "[c]learly . . . evidences a relationship between the utility erecting poles along the highway and the public which uses the roads." *Id.* at 480 (quoting *Cornelius,* 637 N.E.2d at 199) (alterations in *Goldsberry* ). We acknowledge that *Goldsberry* 's foreseeability analysis has been called into question, but we agree with its ultimate conclusion that "it is foreseeable that motorists (or their occupants) will leave the traveled portion of a road and strike utility poles set and maintained along that road." *Id.* In this context, at least, we believe that consideration of the circumstances of a particular collision is more properly left for analyzing breach and proximate cause. Just as the existence of a motorist's duty to other motorists to exercise reasonable care in driving a vehicle is not dependent upon whether those motorists are reckless, sleepy, drunk, or inexperienced, we believe that the existence of a utility's duty to motorists and their passengers to exercise reasonable care in placing its poles should not be dependent upon these factors. Finally, we agree with *Goldsberry* 's conclusion that requiring a utility "to act reasonably and prudently·when placing [its] poles so as not to make such harm unreasonable, is consistent with principles of public policy." *Id.*

■ As for defining the standard of the Utilities' duty of reasonable care, we be-

---

16. In his dissent, then-Judge Rucker noted his agreement with *Goldsberry* and opined that "all three *Webb* factors weigh in favor of imposing a duty on NIPSCO." *Bush,* 685 N.E.2d at 180 (Rucker, J., dissenting).

lieve that Indiana Code Section 8–20–1–28's prohibition against "interfer[ing] with the ordinary and normal public use of the roadway" is helpful, although not dispositive, in this regard.[17] We agree with the *Sell* court's observation that

> [w]here the unjustified or unexcused violation of a duty prescribed by statute may constitute negligence *per se*, it does not follow that compliance with a statute or ordinance constitutes the exercise of reasonable care. W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on the Law of Torts* § 36, p. 233 (5th ed. 1984). "While compliance with a statutory standard is evidence of due care, it is not conclusive on the issue. Such standard is no more than a minimum, and it does not necessarily preclude a finding that the actor was negligent in failing to take additional precautions." *Id.* See also *Restatement (Second) of Torts* § 288C (1965).[18]

*Sell,* 597 N.E.2d at 331 (citation omitted). The legislature's 1988 amendment of the statute does not affect the viability of *Sell*'s analysis on this point.

We need not attempt to formulate a precise definition of the proper standard of care, however, because the undisputed evidence establishes as a matter of law that any breach of the Utilities' duty did not proximately cause Jacobs's death.[19] In *Arnold v. F.J. Hab, Inc.,* 745 N.E.2d 912 (Ind.Ct.App.2001), we stated:

> Whether an act is the proximate cause of an injury, depends upon whether the injury was a natural and probable consequence of the negligent act which, in light of the attending circumstances, could have been reasonably foreseen or anticipated. The negligent act must set in motion the chain of circumstances which contribute to or cause the resulting injury. However, the chain of causation may be broken if an independent agency intervenes between the defendant's negligence and the resulting injury. The key to determining whether an intervening agency has broken the origi-

---

**17.** That being said, we must disagree with Carter's assertion that jumping the hills on Edgewood Avenue at sixty to eighty miles per hour constitutes "the ordinary and normal public use of the roadway" as contemplated by Indiana Code Section 8–20–1–28. To conclude otherwise would be to condone irresponsible and illegal driving and to force utilities to account for extreme instances of reckless behavior in the placement of their poles, thereby frustrating the legislative intent behind the statute.

**18.** Regarding such additional precautions, Carter argues that the Utilities could have obtained a private easement, buried the utility lines, utilized breakaway poles, spaced the poles differently, and placed the poles "as close to the right-of-way as possible." Appellant's Br. at 18. The Utilities observe that Indiana Bell alone

> owns more than 250,000 poles in Indiana, and has joint-use arrangements for another 250,000 poles, *not including* its joint-use arrangements on the very substantial sys-

tems of IPL and [NIPSCO]. These hundreds of thousands of poles are located throughout the State, in positions approved (in many instances decades ago) by state and local governments and in accordance with applicable codes. If utilities were required to guard against every conceivable accident caused by reckless driving—by buying private easements or the like for every line—Indiana's citizens would ultimately bear the hundreds of millions of dollars or more necessary to acquire such easements and to relocate every pole that reckless drivers could hit. Ratepayers would become the involuntary insurers of reckless driving.

Utilities' Br. at 18 (citation omitted).

**19.** We reiterate that unlike the telephone company in *Goldsberry*, the Utilities raised the issues of duty, breach, and proximate cause in their motion for summary judgment. Appellant's App. at 119–28.

nal chain of causation is to decide whether, under the circumstances, it was reasonably foreseeable that the agency would intervene in such a way as to cause the resulting injury. If the intervening cause was not reasonably foreseeable, the original negligent actor is relieved of any and all liability resulting from the original negligent act. The policy underlying proximate cause is that we, as a society, only assign legal responsibility to those actors whose acts are closely connected to the resulting injuries, such that imposition of liability is justified. Although the issue of proximate cause is often determined by the trier of fact, where it is clear that the injury was not foreseeable under the circumstances and that the imposition of liability upon the original negligent actor would not be justified, the determination of proximate cause may be made as a matter of law.

*Id.* at 917 (citations, quotation marks, and brackets omitted).

██ The Utilities argue that

[o]nly one conclusion can be drawn from the undisputed facts of this case: Jacobs' death was the direct result of the superceding, intentional act of Mitchell's reckless driving. The causal chain between any alleged negligence of the Utilities and the Plaintiff's harm was broken by Mitchell's willful, criminal actions.

The utility poles did not cause Mitchell to drive 80 m.p.h. on a road with a 40 m.p.h. speed limit, or to deliberately surrender control of her car by becoming airborne, or to over-steer when she landed, or to leave the roadway. It strains reason to suggest that utilities should foresee the sort of willful disregard for the law and personal safety that indisputably led to this accident.

Utilities' Br. at 20.

We agree. The undisputed evidence indicates that Edgewood Avenue is a straight two-lane thoroughfare with a speed limit of forty miles per hour. The utility poles are located on or near the edge of the right-of-way, approximately three feet from the edge of the roadway. There is nothing to suggest that the poles' location is inherently dangerous to those who engage in the ordinary and normal public use of Edgewood Avenue. The only competent evidence of a prior collision relates to pole 65, which apparently remained untouched from 1978 to 1998. Nothing is known regarding the cause of the prior collision; as such, there is no indication that it resulted from a motorist jumping the hills at twice the posted speed limit. In sum, we conclude as a matter of law that the Utilities could not reasonably have foreseen that Mitchell would intentionally jump the hills on Edgewood Avenue at high speed and that her negligence therefore relieves the Utilities from any and all liability to Carter for their placement of poles 65 and 66. *See Bush*, 685 N.E.2d at 178 (concluding as a matter of law that motorist's "intentional act of driving almost twice the posted speed limit and reckless driving" caused accident, not city and county's allegedly negligent design and maintenance of road). Consequently, we affirm the trial court's grant of summary judgment in favor of the Utilities.

### III. Summary Judgment for the County

Carter observes that the County obtained the right-of-way in which poles 65 and 66 were installed and was responsible for approving the location of the poles pursuant to Indiana Code Section 8–20–1–28. Carter asserts that the County "could have obtained additional right-of-way by eminent domain powers in this section of roadway if necessary so that the poles could have been placed further away from

the road." Appellant's Br. at 36. Additionally, Carter contends that the County's resurfacing of Edgewood Avenue had "exaggerated" the hills, that the County should have erected proper signage "to warn the motoring public of the dangers of jumping or going over the hills at any particular speed[,]" and that the County should have reduced and enforced the speed limit. *Id.*[20]

The County asserts that Carter's claims are barred because Jacobs was contributorily negligent and assumed the risk of harm by suggesting that Mitchell jump the hills on Edgewood Avenue. Indiana's Comparative Fault Act does not apply to governmental entities. *Wallace v. Rosen*, 765 N.E.2d 192, 200 (Ind.Ct.App. 2002) (citing Ind.Code § 34–51–2–2). Therefore, tort claims against governmental entities like the County are subject to common law principles of negligence. *Id.* "As a general rule under the Tort Claims Act, as at common law, both contributory negligence and incurred risk operate to bar a plaintiff's recovery against government actors." *Id.*

In *Wallace*, we explained the distinction between contributory negligence and incurred risk:

Some courts have deemed incurred risk to be merely "a 'species' of contributory negligence while others have demanded that the defenses be kept separate and distinct." Contributory negligence contemplates an objective standard for the determination of "whether a reasonable man would have so acted under similar circumstances"

and is concerned with whether the acceptance of the risk was reasonable and justified in light of the possible benefit versus the risk. Contributory negligence also involves conduct that is "careless" and presupposes a duty and breach thereof, but serves as an affirmative defense to prevent recovery by the plaintiff.

By contrast, incurred risk demands a subjective analysis with inquiry into the particular actor's knowledge, is concerned with the voluntariness of a risk, and is blind as to reasonableness of risk acceptance. Incurred risk also involves a mental state of "venturousness" and has been described as negating a duty and therefore precluding negligence. Generally, the existence of incurred risk and contributory negligence are questions of fact for the jury. The definition of incurred risk includes the proposition that knowledge of a risk may be imputed where such a risk would have been "readily discern[i]ble by a reasonable and prudent man under like or similar circumstances."

Our court has discussed the differences between the two theories, but has concluded that the "importance of reconciling the two definitions becomes apparent only in those situations where incurred risk serves as a defense while contributory negligence does not." "In a negligence action, both defenses are available to a defendant, and the failure to distinguish between the two is without substantive significance."

---

20. We note that the County would be immune under the Indiana Tort Claims Act for its failure to pass an ordinance to reduce the speed limit on Edgewood Avenue. *See Bd. of Comm'rs of County of Harrison v. Lowe*, 753 N.E.2d 708, 720 (Ind.Ct.App.2001), *trans. denied* (2002); Ind.Code § 34–13–3–3(8) (granting immunity for governmental entity's "adoption and enforcement of or failure to adopt or enforce a law"). The County would likewise be immune for its alleged failure to enforce the speed limit. *See* Ind.Code § 34–13–3–3(8).

*Id.* at 200–01 (citations omitted). We conclude that the County is entitled to summary judgment under either theory.

 Any contributory negligence on Jacobs's part, however slight, will bar Carter's claim against the County, provided that Jacobs's negligence proximately contributed to his injuries. *St. John Town Bd. v. Lambert,* 725 N.E.2d 507, 516 (Ind. Ct.App.2000). Jacobs's contributory negligence will bar all recovery regardless of any negligence on the County's part. *Id.*

Contributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to the harm he has suffered, which falls below the standard to which he is required to conform for his own protection. A plaintiff must exercise that degree of care which an ordinarily reasonable person would exercise in like or similar circumstances.

*Peavler v. Bd. of Comm'rs of Monroe County,* 557 N.E.2d 1077, 1080 (Ind.Ct. App.1990) (citations omitted), *trans. denied.* "[T]he existence of contributory negligence is usually a question of fact for the jury unless the facts are undisputed and only a single inference can be drawn therefrom." *St. John Town Bd.,* 725 N.E.2d at 516.

Our supreme court has stated that automobile passengers are "under the duty to use reasonable care to avoid injuring themselves." *Stephenson v. Ledbetter,* 596 N.E.2d 1369, 1372 (Ind.1992); *see also Burell v. Riggs,* 557 N.E.2d 698, 700 (Ind.Ct. App.1990) ("A passenger in an automobile must exercise for her own protection the degree of care an ordinarily reasonable person would exercise in like or similar circumstances."), *trans. denied* (1991); *Colaw v. Nicholson,* 450 N.E.2d 1023, 1026 (Ind.Ct.App.1983) ("A passenger in an automobile is bound to use the reasonable and ordinary care of a prudent person under the circumstances to avoid injury to

himself."). "Simply because a person is a passenger does not mean he is absolved from all personal responsibility for his own safety." *Stephenson,* 596 N.E.2d at 1372. In *Burell,* a passenger was contributorily negligent in choosing to ride with a driver who she knew was extremely tired. *Burell,* 557 N.E.2d at 701. In *Peavler,* the intoxicated passenger was contributorily negligent in choosing to ride with an intoxicated driver. *Peavler,* 557 N.E.2d at 1081–82.

The County notes that Jacobs had jumped the hills on Edgewood Avenue at least twenty times before and thus "willingly engaged in an unlawful and reckless activity, one that required careening over hills at illegal speeds." County's Br. at 10. The County argues that "[t]he dangers of this activity are obvious." *Id.* at 11. Carter emphasizes that Jacobs was not the driver of the car and that he "had never gone over the hills at the speed Sarah Mitchell was going at the time of the accident." Appellant's Br. at 38.

Be that as it may, only a single inference can be drawn from the undisputed evidence that Jacobs suggested that Mitchell jump the hills in her Honda. This activity required a sufficiently high speed for the car to become airborne, the dangers of which are indeed obvious to a reasonable person. We therefore conclude as a matter of law that Jacobs failed to exercise reasonable care for his safety and that his contributory negligence proximately contributed to his injuries, thereby barring Carter's claims against the County.

 Finally, we note that incurred risk may be found as a matter of law if the evidence is without conflict and the sole inference to be drawn is that the [injured party] knew and appreciated the risk, but nevertheless accepted it voluntarily. To incur risk, the

injured party must have been more than generally aware of the potential for injury, but must have had actual knowledge of the specific risk. The [injured party] need not have foresight that the particular injury which in fact occurred was going to occur.

*Meyers v. Furrow Bldg. Materials,* 659 N.E.2d 1147, 1149–50 (Ind.Ct.App.1996) (citations and footnote omitted), *trans. denied.* Jacobs had jumped the hills on Edgewood Avenue at least twenty times. In her deposition, Carter stated that she had told Jacobs not to speed and that "you can die in a car[.]" Appellant's App. at 280. From this evidence, we conclude as a matter of law that Jacobs knew and appreciated the risk of jumping the hills but nevertheless accepted it voluntarily. Jacobs's assumption of the risk also bars Carter's claims against the County. We therefore affirm the trial court's grant of summary judgment in favor of the County.

Affirmed.

NAJAM, J., and BARNES, J., concur.