Alan STOWERS and Sherry Stowers, Appellants–Plaintiffs,

v.

CLINTON CENTRAL SCHOOL CORPORATION, Appellee–Defendant.

No. 49A02–0504–CV–288.

Court of Appeals of Indiana.

Oct. 26, 2006.

D. Bruce Kehoe, Christopher G. Stevenson, Wilson Kehoe & Winingham, Indianapolis, IN, Attorneys for Appellants.

Darla S. Brown, William H. Kelley, Kelley, Belcher & Brown, Bloomington, IN, Attorneys for Appellee.

## OPINION

KIRSCH, Chief Judge.

Alan and Sherry Stowers ("the Stowers") brought a wrongful death claim against Clinton Central School Corporation ("Clinton Central") for the death of their son, Travis Stowers, alleging that Clinton Central acted negligently, which proximately caused their son's death. They appeal after a jury verdict in favor of Clinton Central and raise five issues, which we restate as:

I. Whether the trial court erred in denying the Stowers' motion for summary judgment which alleged that neither they nor Travis had incurred or assumed any risk, that Travis was not contributorily negligent, and that Clinton Central acted negligently, proximately causing Travis's death;

II. Whether the trial court abused its discretion when it denied the Stowers' motion for judgment on the evidence;

III. Whether the trial court abused its discretion when it admitted the release forms into evidence;

IV. Whether the trial court abused its discretion when it denied the Stowers' proposed jury instruction regarding the release forms; and

V. Whether the trial court abused its discretion in instructing the jury as to the doctrine of incurred risk.

We affirm in part, reverse in part and remand.

## FACTS AND PROCEDURAL HISTORY[1]

On July 31, 2001, Travis was seventeen years old and an incoming junior at Clinton Central High School, where he was a member of the football team. Travis had played organized football since the fifth grade, and he had played the two previous years on the high school football team under Coach George Gilbert.

July 30, 2001 was the first day of football practice for the 2001–2002 season. The first two days of practice were "no contact" days, which meant that there was to be no physical contact between the players. The players only wore helmets, shoulder pads, mesh jerseys, and shorts. Coach Gilbert had used the same practice schedule for many years, and it was provided to parents in advance and posted on the internet. Coach Gilbert had never received any complaints from players or parents regarding the schedule.

Prior to the start of the football season, Travis spent time during the summer doing chores around the family farm, which included taking care of the family's livestock, baling hay, and mending fences. He also baled hay for other farmers. Travis had no trouble participating in these chores in the summer and was encouraged by his parents to take breaks and drink lots of water while working outside. Additionally, in the summer of 2001, Travis had attended a football lineman's camp at DePauw University, which was held outdoors and consisted of three practices a day, with drills that were very similar to the ones

---

1. Oral argument was heard on this case on February 21, 2006 in Indianapolis. We commend counsel on the quality of their written and oral advocacy.

used by Coach Gilbert. Travis also participated in Clinton Central's summer weightlifting and conditioning program and ran on his family's treadmill. He had no problems performing any of these activities. One week prior to the beginning of football practice, Travis traveled to Washington, D.C. to attend a Future Farmers of America leadership conference. Therefore, he missed a week of pre-season conditioning and returned home on the day before practices were to begin.

On the first day of football practice, which was hot and humid, Travis did not experience any adverse reaction to the heat. That night, Travis told his parents that some players had vomited during that first day of practice. *Tr.* at 469–70. The Stowers told Travis that the next day was going to be equally hot and that he should be sure to drink lots of water. *Id.* at 470.

On July 31, 2001, Coach Gilbert checked the weather reports on both television and the internet before beginning practice. The day was hot and humid, but no heat advisories had been issued by the National Weather Service. Although at that time, Clinton Central did not have any means of measuring the on-field temperature and humidity to determine the heat index, it had been given charts by the IHSAA and the Indiana Department of Education that could be used for that purpose. Clinton Central did not use these charts on July 31. Coach Gilbert had posted information disseminated by the IHSAA on heat-related illnesses near the scales in the locker room. The players were to monitor their water weight loss by weighing in every morning and weighing out every afternoon and documenting their weights on a chart. They were to report to the coaches if there was any abnormal weight loss. Travis weighed in on July 30 at 256 pounds and weighed out at 254 pounds; on July 31, he weighed in at 254 pounds.

The football coaches and the team athletic trainer, Ericka Daniels, stressed the importance of hydration to the players. During practice, water was supplied by a water tree, which consisted of a PVC pipe several yards in length attached to a hose. Water would shoot continuously out of holes in the pipe. The players could leave practice and get water any time they felt they needed it. The coaches and trainer repeatedly told the players that if they felt ill in any way, they were to tell one of the coaches or Daniels.

Morning practice on July 31 began at 7:30 a.m. and ran until 10:00 a.m., followed by a ninety-minute rest period and a twenty-minute team meeting. Afternoon practice ran from 12:00 p.m. until 2:00 p.m. At the time of this incident, IHSAA Rule 54–4 stated in pertinent part:

> The first two days [of football practice] shall be non-contact practices limited to two 90–minute sessions per day or less with a two-hour break between sessions. There shall be no live contact between participants and protective equipment is limited to helmet, shoes, shoulder pads and mouthpieces. Footballs may be used. The two days are to be used primarily for physical conditioning, sprints, agility drills, etc.

*Pl.'s Ex.* 3, p. 76.

The morning practice consisted of activities such as "stretch," "crash," and "offensive drills." *Pl.'s Ex.* 1. "Stretch" included actual stretching, touching toes, and jumping jacks. "Crash" was physical conditioning where players would go to different stations and perform activities such as push-ups, sit-ups, and running drills. On the morning of July 31, the time allotted for "crash" was shortened by half. For the rest of the morning, offensive linemen, like Travis, were taught several different blocking techniques, which was done by putting the players in the correct stance

and working on their steps. *Tr.* at 811–12. Players were given water breaks every fifteen to twenty minutes. Players were to keep their helmets on when they were on the football field, which included wearing them on water breaks until they reached the water tree area.

During morning practice, at approximately 7:50 a.m., Coach Gilbert observed Travis having "dry heaves" during the "crash" portion of practice and Travis stopped his activity for a minute. When he resumed his activity, Coach Gilbert continued to monitor him. After morning practice ended, the offensive line coach, Coach Marvin Boswell, saw Travis vomit. Coach Boswell asked Travis if he felt better, and Travis responded that he did. *Id.* at 817. Coach Boswell also told Travis to make sure he replenished his fluids, and Travis agreed to do so. *Id.* at 818. Another coach, Coach Jamie Bolinger, also saw Travis vomit after the morning practice and asked if he was okay, and Travis answered affirmatively. *Id.* at 758.

During the rest period, Travis ate some lunch and kept it down. He also spent time lying on the floor of the locker room. Right before the team meeting, Coach Boswell saw Travis and asked him how he was feeling. Coach Boswell thought that Travis looked pretty good and had color in his face. *Id.* at 820. Over the lunch break, the coaches discussed Travis's vomiting and another player's light-headedness and agreed they would watch these players during the afternoon practice. At the team meeting, Coach Gilbert lightheartedly mentioned that Travis had gotten sick in the morning and asked him if he was okay, to which Travis smiled and responded that he was. *Id.* at 915.

Afternoon practice again consisted of "stretch" and "crash," the latter of which was shortened. It was also decided that water breaks would be given every ten minutes that afternoon, and that sprints would be cut from practice. After "crash," the players worked on defensive techniques, which included a lot of repetition of stances. Although Travis's brother, Jared, testified that Travis "seemed a little dizzy" during these drills, Coach Boswell did not notice Travis having any trouble with them. *Id.* at 264, 827. Approximately ten or fifteen minutes before practice was to end, Travis went to Coach Jeffrey Parker and told him that he did not feel well. *Id.* at 784. Coach Parker asked Travis what was wrong, and Travis said he did not know. *Id.* Travis then asked if they were going to run sprints that afternoon, and when Coach Parker told him they were not, Travis smiled. *Id.* The water whistle blew, and Coach Parker told Travis to go get some water. *Id.*

While Coach Parker spoke to Travis, he did not notice any indication that Travis was ill or suffering from any heat-related problems. During the water break, at approximately 1:45 p.m., several players yelled for the coach because Travis had collapsed near the water tree. Daniels and Coach Gilbert assisted Travis in removing his helmet and shoulder pads and in loading him on a golf cart to take him to the locker room. In the locker room, Daniels placed Travis in a cool shower and placed ice around him. Coach Gilbert called 911, and Travis was taken away by ambulance. Travis lost consciousness in the locker room, which he never regained, and he died around 4:00 a.m. the following day.

On July 26, 2002, the Stowers filed a complaint against Clinton Central alleging that Clinton Central had acted negligently and proximately caused Travis's death. On July 15, 2003, the Stowers filed a motion for summary judgment as to the negligence of Clinton Central and as to Clinton Central's affirmative defenses. Both of

these motions were denied. Clinton Central also filed a motion for summary judgment, raising the affirmative defenses of incurred risk and contributory negligence, which was denied by the trial court. A jury trial was held, and at its conclusion, the jury returned a verdict in favor of Clinton Central. The Stowers filed a motion to correct errors and for judgment on the evidence, which was denied by the trial court. The Stowers now appeal.

## DISCUSSION AND DECISION

### I. Summary Judgment

When reviewing a grant or denial of summary judgment, we apply the same standard as the trial court: summary judgment is only appropriate when the designated evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Jacobs v. Hilliard*, 829 N.E.2d 629, 632 (Ind. Ct.App.2005), *trans. denied.* The burden is on the moving party to designate sufficient evidence to eliminate any genuine issues of material fact, and when this requirement is fulfilled, the burden shifts to the nonmoving party to come forth with contrary evidence. *Jacobs*, 829 N.E.2d at 632. We construe all facts and reasonable inferences to be drawn from those facts in favor of the nonmoving party. *Id.* The entry of specific findings and conclusions offer insight into the reasons for the trial court's decision and facilitate appellate review, but are not binding on this court. *Troxel Equip. Co. v. Limberlost Bancshares*, 833 N.E.2d 36, 40 (Ind.Ct.App. 2005), *trans. denied.*

 The Stowers argue that the trial court erred when it denied their motions for summary judgment regarding Clinton Central's negligence as a matter of law and as to Clinton Central's ability to raise contributory negligence and incurred risk as affirmative defenses. This is not a case brought under Indiana's Comparative Fault Act, which does not apply to governmental entities, such as public schools and their employees. *Wallace v. Rosen*, 765 N.E.2d 192, 200 (Ind.Ct.App.2002). Tort claims against such defendants are subject to the common law principles of negligence, and both contributory negligence and incurred risk operate to bar a plaintiff's recovery against governmental actors. *Id.*

 The Stowers specifically argue that the trial court erred when it denied their summary judgment motion as to the negligence of Clinton Central because they believe that Clinton Central was negligent as a matter of law. Negligence consists of three elements: (1) a duty on the part of the defendant owed to the plaintiff; (2) a breach of that duty; and (3) an injury to the plaintiff that was proximately caused by that breach. *Dennis v. Greyhound Lines, Inc.*, 831 N.E.2d 171, 173 (Ind.Ct. App.2005), *trans. denied.* Our Supreme Court has recognized that a duty exists on the part of school personnel to exercise ordinary and reasonable care for the safety of the children under their authority. *Mark v. Moser*, 746 N.E.2d 410, 414 (Ind. Ct.App.2001). Summary judgment is generally inappropriate in negligence cases because they "are particularly fact sensitive and are governed by a standard of the objective reasonable person—one best applied by a jury after hearing all of the evidence." *Rhodes v. Wright*, 805 N.E.2d 382, 385 (Ind.2004).

The Stowers claim that the undisputed facts support a conclusion that Clinton Central breached its duty to Travis. First, they argue that Clinton Central was obligated to comply with IHSAA Rule 54–4 and the practice exceeded the time limits set forth under that rule. Second, they

assert that although the IHSAA supplied materials regarding heat-related illness to Clinton Central, Clinton Central did not recognize that Travis was suffering from heat stroke, and returned Travis to practice without having Daniels examine him, despite the "high risk" of heat-related illness and the fact that Travis had vomited earlier in the day. We disagree.

■ Although Clinton Central's practice on July 31, 2001 may have exceeded the stated limits of Rule 54–4, the designated evidence showed that Coach Gilbert responded to the heat and modified the practice schedule by shortening the "crash" portions, eliminating sprints, and adding more frequent water breaks. The coaches emphasized the importance of drinking fluids, which were available at any time during practice in the end zone, and told the players to contact one of them or Daniels if they did not feel well. During the lunch break, several coaches approached Travis to inquire as to how he was feeling, and he responded that he was fine. During the afternoon practice session, the coaches saw no indication that Travis was feeling ill until he collapsed. After Travis collapsed, Daniels and Coach Gilbert took him by golf cart to the locker room where he was placed in a cool shower and they called 911. Based on this evidence, we conclude that a genuine issue of material fact exists as to whether Clinton Central was negligent as a matter of law, and the trial court did not err when it denied summary judgment on this issue.

■ The Stowers also claim that the trial court erred when it denied their motion for summary judgment as to Clinton Central's affirmative defense of contributory negligence. Contributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to the harm he has suffered, which falls below the standard to which he should conform for his own protection and safety. *Carter v. Indianapolis Power & Light Co.*, 837 N.E.2d 509, 523 (Ind.Ct.App.2005). A plaintiff must exercise that degree of care which an ordinary reasonable person would exercise in like or similar circumstances. *Id.* However, contributory negligence must be the proximate cause of the plaintiff's injury in order to constitute a complete bar to recovery. *Id.*

The Stowers specifically rely on two findings by the trial court for their contention that summary judgment should have been granted as to contributory negligence. First, the trial court found that Travis acted reasonably by performing the conditioning and practice drills during football practice and second, that he acted reasonably by being willing to endure physical hardship to better himself and the team. *Appellants' App.* at 29. Although in these findings, the trial court states that Travis acted reasonably, we do not believe that they foreclosed the issue of whether Travis was contributorily negligent. The findings only determine that Travis was not unreasonable in actually participating in football practice on July 31, 2001; the findings do not establish that every action he took on that date was reasonable.

■ The designated evidence showed that Travis was repeatedly told by the coaches, Daniels, and his parents the importance of drinking the appropriate amounts of fluids while being in the heat. Coach Gilbert also instructed the players that if they were not feeling well they had the right to stop what they were doing and to notify one of the coaches or Daniels. Travis had the opportunity to go see Daniels when he was not feeling well, but chose not to do so. Further, when members of the coaching staff inquired as to Travis's well being during the lunch break, Travis reported to each of them that he was fine. We therefore conclude that a

genuine issue of material fact existed as to whether Travis was contributorily negligent as a matter of law, and the trial court did not err in denying summary judgment as to this issue.

▮ The Stowers next contend that there was no genuine issue of material fact as to incurred risk by signing the release forms or by Travis participating in football practice on July 31, 2001. The affirmative defense of incurred risk requires evidence of a plaintiff's actual knowledge and appreciation of the specific risk involved and voluntary acceptance of that risk. *Kostidis v. Gen. Cinema Corp. of Indiana*, 754 N.E.2d 563, 571 (Ind.Ct.App.2001), *trans. denied.* A plaintiff must have more than just a general awareness of a potential for injury. *Id.* Incurred risk also involves a mental state of "venturousness" and has been described as negating a duty and therefore precluding negligence. *Carter*, 837 N.E.2d at 522.

Here, the trial court made a specific finding that Travis did not have actual knowledge of the specific risk of heat stroke. *Appellants' App.* at 34. The trial court's specific findings of fact are not binding on this court, but they do offer insight into the rationale for the trial court's decision and facilitate appellate review. *See Troxel Equip. Co.*, 833 N.E.2d at 40. We note that this finding by the trial court would have been sufficient to grant summary judgment, but no designated evidence was shown to support this finding. The designated evidence showed that the coaches and the trainer repeatedly stressed the importance of proper fluid intake and information disseminated by the IHSAA regarding heat-related illnesses was posted in the locker room. The Stowers had discussions with Travis about drinking fluids when in the heat, and after Travis had reported that other players had gotten sick at practice on July 30, they re-

enforced the necessity to drink fluids often and not to overdo it in the heat. We conclude that a question of fact existed as to whether Travis had actual knowledge of the specific risk and incurred the risk. The trial court did not err in denying summary judgment as to incurred risk.

## II. Judgment on the Evidence

▮ The purpose of a motion for judgment on the evidence is to test the sufficiency of the evidence, and the grant or denial of a motion for judgment on the evidence is within the broad discretion of the trial court and will be reversed only for an abuse of that discretion. *Northrop Corp. v. Gen. Motors Corp.*, 807 N.E.2d 70, 86 (Ind.Ct.App.2004), *trans. denied.*

> Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict.

Ind. Trial Rule 50(A). When reviewing a trial court's ruling on a motion for judgment on the evidence, we use the same standard as the trial court. *Faulk v. Nw. Radiologists, P.C.*, 751 N.E.2d 233, 238 (Ind.Ct.App.2001), *trans. denied.* The evidence is considered in the light most favorable to the non-moving party. *Id.* We will not substitute our judgment for that of the jury on questions of fact. *Id.* We determine only: (1) whether there exists any reasonable evidence supporting the claim; and (2) if such evidence does exist, whether the inference supporting the claim can be drawn without undue speculation. *Id.*

The Stowers argue that the trial court abused its discretion when it denied their motion for judgment on the evidence. They contend that the jury's verdict was

contrary to the evidence presented at trial because the evidence was overwhelmingly in their favor and insufficient to support the jury's verdict. In this argument, the Stowers raise much of the same evidence as they raised for their preceding arguments on the denial of summary judgment. We conclude that the trial court did not abuse its discretion in denying the Stowers' motion for judgment on the evidence because there were issues of fact and evidence presented to the jury, as set out elsewhere in this opinion, which supported the jury's verdict.

### III. Admission of Release Forms

The decision to admit or exclude evidence is within the sound discretion of the trial court and is afforded great deference on appeal. *Davidson v. Bailey*, 826 N.E.2d 80, 85 (Ind.Ct.App.2005) (quoting *Bacher v. State*, 686 N.E.2d 791, 793 (Ind.1997)). A decision will be reversed only for a manifest abuse of that discretion. *Id.* An abuse of discretion occurs if the trial court's decision is against the logic and effect of the facts and circumstances before the court. *Sullivan Builders & Design, Inc. v. Home Lumber of New Haven, Inc.*, 834 N.E.2d 129, 134 (Ind.Ct.App.2005), *trans. denied.* We will not reverse the trial court's admission of evidence absent a showing of prejudice. *Id.*

The Stowers argue that the trial court erred by allowing the IHSAA Acknowledgement and Release Form and the Clinton Central Athletic Department's Acknowledgment and Release Forms (collectively "the Release Forms") into evidence during the trial. They specifically contend that the Release Forms should not have been admitted because they did not contain the word negligence and were therefore not relevant evidence. Ind. Evidence Rule 401, states:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Prior to the beginning of football season, Travis's mother, Sherry, signed Clinton Central's release form, which gave permission for Travis to participate in organized athletics and acknowledged that in such activities the potential for injuries is inherent and may be a possibility. *Appellant's App.* at 180; *Def.'s Ex.* H. Additionally, both Sherry and Travis signed the IHSAA release form, which acknowledged that there was a risk of serious injury and even death from athletic participation and showed that they accepted all responsibility for Travis's safety. *Appellant's App.* at 181; *Def.'s Ex.* I. It also contained language holding the school and the IHSAA harmless of any responsibility and liability for any injury or claim resulting from athletic participation. *Id.* Clinton Central moved to admit the Release Forms at trial, the Stowers objected, and the trial court admitted them over this objection.

At issue at the trial was whether Clinton Central was negligent in conducting football practice and whether Travis was either contributorily negligent or had incurred the risk involved. We conclude that the Release Forms were relevant as to the defense of incurred risk and were therefore admissible. "The affirmative defense of incurred risk requires evidence of a plaintiff's actual knowledge and appreciation of the specific risk involved and voluntary acceptance of that risk." *Kostidis*, 754 N.E.2d at 571 (citing *Town of Highland v. Zerkel*, 659 N.E.2d 1113, 1121 (Ind.Ct.App.1995), *trans. denied*). The Release Forms outlined the risks involved in athletic participation and stated that serious injury and even death

were possible in such participation. They were relevant as to the affirmative defense of incurred risk, and the admission of them into evidence for that limited purpose was not an abuse of discretion.

### IV. Proposed Jury Instruction

■■ We review a trial court's refusal to tender a requested jury instruction for an abuse of discretion. *America's Directories Inc., Inc. v. Stellhorn One Hour Photo, Inc.*, 833 N.E.2d 1059, 1066 (Ind.Ct. App.2005), *trans. denied.* The trial court's refusal to give a tendered instruction will be reversed if: (1) the instruction is a correct statement of law; (2) it is supported by the evidence; (3) it does not repeat material adequately covered by other instructions; and (4) the substantial rights of the tendering party would be prejudiced by the failure to give the instruction. *Id.*

The Stowers contend that the trial court erred when it refused to give their proposed jury instruction regarding the Release Forms. At the close of evidence, the Stowers offered a final instruction, which they asserted set forth the applicable standard of law to be applied when considering the Release Forms. The instruction stated:

> As a matter of law, the Plaintiffs Alan and Sherry Stowers have not released the Defendant Clinton Central from any alleged negligent acts when the release forms at issue contain language expressly addressing the risks inherent in the sport of football and other vigorous physical activity, but nowhere expressly state the release of Clinton Central or its agents from their own negligence.

*Appellant's App.* at 102. The trial court refused to give the proposed instruction. The Stowers argue that this instruction should have been given because it would have defined the scope of the Release Forms and provided guidance to the jury on how to consider the documents.

■ It is well established in Indiana that exculpatory agreements are not against public policy. *Marsh v. Dixon,* 707 N.E.2d 998, 1000 (Ind.Ct.App.1999), *trans. denied.* "Generally, parties are permitted to agree that a party owes no obligation of care for the benefit of another, and thus, shall not be liable for consequences that would otherwise be considered negligent." *Id.* However, this court has held that an exculpatory clause will not act to absolve a party from liability unless it " 'specifically and explicitly refer[s] to the negligence of the party seeking release from liability.' " *Id.* (quoting *Powell v. Am. Health Fitness Ctr. of Fort Wayne, Inc.,* 694 N.E.2d 757, 761 (Ind.Ct.App. 1998)).

■ The Stowers' proposed instruction set out that the Release Forms did not absolve Clinton Central of liability for negligent acts if they did not contain language specifically referring to negligence; thus, it was a correct statement of the law. Because the Release Forms did not contain any specific or explicit reference to the negligence of Clinton Central or the IHSAA, the proposed instruction was supported by the evidence. No other instructions were given that adequately covered the information in the Stowers' instruction. The substantial rights of the Stowers were prejudiced by the failure to give the instruction because the admission of the Release Forms without the redaction of the language regarding release could have been exceptionally prejudicial to the Stowers. A jury reading the Release Forms without a limiting instruction might conclude that the Stowers released Clinton Central of liability when the trial court had already determined that they had not as a matter of law in the summary judgment order. We conclude that the trial court

abused its discretion when it refused to give the Stowers' proposed instruction regarding the Release Forms. We therefore reverse and remand for a new trial and instruct the trial court to give an instruction stating the correct law regarding the Release Forms.

## V. Incurred Risk Instruction

■■■ Instructing the jury lies within the sound discretion of the trial court, and we will reverse only for an abuse of that discretion. *St. Margaret Mercy Healthcare Ctrs. v. Poland*, 828 N.E.2d 396, 404 (Ind.Ct.App.2005), *trans. denied.* To constitute an abuse of discretion, the instruction given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury. *Id.*

The Stowers argue that the trial court abused its discretion when it gave Final Instruction 22(A) on incurred risk. They contend that the instruction was an incomplete and incorrect statement of the incurred risk doctrine and was given in error. Final Instruction 22(A) stated:

> When a person knows of a danger, understands the risk involved and voluntarily exposes himself to such danger, that person is said to have "incurred the risk" of injury. In determining whether a person incurred the risk you may consider the experience and understanding of a person, whether a person had reasonable opportunity to abandon the course of action, and whether a person of ordinary prudence, under the circumstances, would have refused to continue and would have abandoned the course of conduct.

*Appellant's App.* at 101. The Stowers claim that Final Instruction 22(A) failed to instruct the jury on two essential elements of incurred risk: (1) that the plaintiff must have actual knowledge and appreciation of the specific risk; and (2) that the knowledge must be more than a general awareness. They point to Indiana's pattern jury instruction regarding incurred risk, which states:

> The plaintiff incurs the risk of injury if [he] actually knew of a specific danger, understood the risk involved, and voluntarily exposed [himself] to that danger. Incurred risk requires much more than the general awareness of a potential for mishap. Determining whether the plaintiff had incurred the risk of injury requires a subjective analysis focusing upon:
>
> 1. The plaintiff's actual knowledge and appreciation of the specific risk, and
>
> 2. The plaintiff's voluntary acceptance of that risk.

Ind. Pattern Jury Instruction (Civil) 5.41 (2d ed.2003).

In *Kostidis*, the trial court, over objection, gave a jury instruction on incurred risk with language almost identical to Final Instruction 22(A). 754 N.E.2d at 570. The trial court also refused to give an instruction that contained language that the plaintiff must have actual knowledge and appreciation of the specific risk involved and that the plaintiff must have more than a general awareness of the risk. *Id.* at 571. On appeal, this court found that although the proposed instruction was a correct statement of the law and would have provided a fuller explanation of the law regarding awareness of risk, the instruction that was given covered the same issue and was not incorrect, and the trial court did not abuse its discretion in giving the instruction. *Id.*

■■ Although the instruction given in *Kostidis* was found not to be in error, that case was factually different from the present case. There, the specific risk at issue

was the danger of slipping on ice or snow in the parking lot where a movie theater was located. The plaintiff testified that he knew that there was ice and snow on the ground, assumed that there would be ice and snow in the parking lot, and knew he should be watchful for icy conditions. *Id.* While not deciding whether the trial court erred in the present case by giving Final Instruction 22(A), we believe that in its exercise of discretion on remand, the trial court should give the pattern jury instruction to provide the jury with the fullest explanation of the law on incurred risk.

Affirmed in part, reversed in part, and remanded.

ROBB, J., and CRONE, J., concur.