# FOR PUBLICATION



ATTORNEY FOR APPELLANTS:

**CHARLES P. RICE**
Boveri Murphy Rice, LLP
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**BRIAN M. KUBICKI**
**ROBERT M. EDWARDS**
**COLIN J. REILLY**
Jones Obenchain, LLP
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JASON AND JUSTINA KRAMER, | ) | |
| | ) | |
| Appellants-Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 71A03-1308-CT-301 |
| | ) | |
| CATHOLIC CHARITIES OF THE DIOCESE OF | ) | |
| FORT WAYNE-SOUTH BEND, INC., | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE ST. JOSEPH CIRCUIT COURT
The Honorable Michael G. Gotsch, Sr., Judge
Cause No. 71C01-1104-CT-53

**March 28, 2014**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Jason Kramer and Justina Kramer appeal the trial court's entry of summary judgment in favor of Catholic Charities of the Diocese of Fort Wayne-South Bend, Inc. ("Catholic Charities") on the Kramers' complaint alleging that Catholic Charities was negligent in facilitating a pre-adoption placement of a child with them. The Kramers present several issues for our review which we consolidate and restate as whether the trial court erred when it concluded that a release executed by the Kramers bars their negligence claims against Catholic Charities.

We reverse and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

The facts in this case are undisputed. In March 2010, M.S., who was pregnant and unmarried, contacted Catholic Charities about arranging an adoption of her unborn child. M.S. told Catholic Charities that the father of the unborn child was one of two men she had been with, but she declined to identify either man. Catholic Charities facilitated a meeting between M.S. and the Kramers. On March 23, M.S. told the Kramers that she would like them to adopt her baby. M.S. gave birth to E. on May 1, and the Kramers were present at the hospital. On May 2, M.S. signed paperwork agreeing to the adoption of E. by the Kramers.

Also on May 2, the Kramers and Laura Kanalas, an adoption specialist with Catholic Charities, signed a document entitled "Acknowledgement of At-Risk Placement" (hereinafter "the release"). That document provided as follows:

> We, Jason and Justina Kramer, the undersigned, are the prospective adoptive parents of the above-listed child. We, [sic] hereby acknowledge

2

the pre-adoptive placement of the child with us by Catholic Charities . . . . We further acknowledge our understanding and agreement that Catholic Charities has made no promise or representations to us regarding the permanency of this placement. We understand that the placement is at-risk and subject to termination. We understand that this placement is conditioned upon our proper filing of an appropriate petition to adopt the child in a court of competent jurisdiction within 14 days of this date and that the placement is subject to the successful outcome of that legal proceeding for our adoption of the child.

In addition, we understand that the father/putative father of the child may possess and/or exercise certain legal rights concerning the child, which could adversely affect the placement of the child with us and/or our ability to adopt the child. We understand that the placement of the child with us will remain at-risk until the successful completion of the timely filed adoption proceedings and all rights of the father/putative father are fully and finally terminated or waived in accordance with the law. We agree that[,] in the event we do not timely file an appropriate adoption petition and diligently complete that action, the adoption proceeding is not successfully completed. We also understand that[,] if the father/putative father claims or chooses to exercise his legal rights within the limits of the law, we will immediately return the child to the custody of Catholic Charities at the request of Catholic Charities without recourse against Catholic Charities.

Appellants' App. at 91. The Kramers took E. home with them on May 3.

On May 11, the Kramers met with Barbara Burlingham, an adoption specialist with Catholic Charities. On that date, the Kramers and Burlingham executed a document entitled "Acknowledgement of Temporary At-Risk Placement," which was identical to the document the Kramers had signed on May 2 except that they agreed to file a petition for adoption within thirty days instead of fourteen days.[1] On May 25, Kelsie Jo Deeds, a family services supervisor with Catholic Charities, contacted the Indiana State Health Department ("ISHD") to determine whether anyone claiming to be E.'s father had registered with the putative father registry. On that same date, Mary Thurman, the

---

[1] There are minor, non-substantive differences in the wording and grammar of the two documents.

3

administrator of the putative father registry, executed an affidavit stating that no one had registered and no paternity determination was on file with the ISHD regarding a child born to M.S.

On June 1, Deeds contacted the ISDH a second time to check the putative father registry. On that date, Thurman conducted the same search and discovered that, on April 27, R.M. had registered with the ISDH as the putative father of M.S.'s child. The parties do not know why R.M.'s registration had not been discovered during the search on May 25.

M.S. confirmed that R.M. was "the most likely father of her child, but that for reasons of her own, she had not previously named him as the father." Id. at 7. Burlingham promptly notified the Kramers and their attorney about R.M.'s registration with the ISDH. The Kramers proceeded to file a petition to adopt E., and on July 21, R.M. filed a motion to contest the adoption. R.M. subsequently proved his paternity of E. with a DNA test, and he filed a petition to establish paternity and requested custody of E. On December 23, the trial court entered an order granting custody of E. to R.M., and, on January 16, 2011, the Kramers relinquished custody of E. to R.M.

On April 15, the Kramers filed a complaint against Catholic Charities alleging negligence. The Kramers alleged in relevant part that Catholic Charities was negligent when it failed to check the putative father registry before placing E. with them. In February of 2013, Catholic Charities moved for summary judgment alleging that the Kramers had executed documents releasing Catholic Charities from all liability related to

4

the pre-adoption placement. Following a hearing, the trial court entered summary judgment in favor of Catholic Charities. This appeal ensued.

## DISCUSSION AND DECISION

Our standard of review for summary judgment appeals is well established:

When reviewing a grant [or denial] of summary judgment, our standard of review is the same as that of the trial court. Considering only those facts that the parties designated to the trial court, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment as a matter of law." In answering these questions, the reviewing court construes all factual inferences in the non-moving party's favor and resolves all doubts as to the existence of a material issue against the moving party. The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law; and once the movant satisfies the burden, the burden then shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact.

Dreaded, Inc. v. St. Paul Guardian Ins. Co., 904 N.E.2d 1267, 1269-70 (Ind. 2009) (citations omitted). The party appealing a summary judgment decision has the burden of persuading this court that the grant or denial of summary judgment was erroneous. Knoebel v. Clark County Superior Court No. 1, 901 N.E.2d 529, 531-32 (Ind. Ct. App. 2009). Where the facts are undisputed and the issue presented is a pure question of law, we review the matter de novo. Crum v. City of Terre Haute ex rel. Dep't of Redev., 812 N.E.2d 164, 166 (Ind. Ct. App. 2004).

The Kramers first contend that the trial court erred when it concluded that the releases operate to bar their negligence claims. In support of that contention, they cite Stowers v. Clinton Central School Corporation, 855 N.E.2d 739, 749 (Ind. Ct. App. 2006), trans. denied, where we observed that "an exculpatory clause will not act to

5

absolve a party from liability [from negligence] unless it 'specifically and explicitly refer[s] to the negligence of the party seeking release from liability.'" (Quoting Powell v. Am. Health Fitness Ctr. of Ft. Wayne, Inc., 694 N.E.2d 757, 761 (Ind. Ct. App. 1998)). Here, it is undisputed that the releases do not explicitly release Catholic Charities for its negligence.

Still, Catholic Charities maintains that an exception to the rule in Stowers applies here. In Anderson v. Four Seasons Equestrian Center, 852 N.E.2d 576, 581 (Ind. Ct. App. 2006), trans. denied, we held that an exculpatory clause may be found sufficiently specific and explicit on the issue of negligence even in the absence of the word itself. We stated that "'an exculpatory clause not referring to the negligence of the release may act to bar liability for those damages incurred which are inherent in the nature of the activity[.]'" Id. (quoting Marsh v. Dixon, 707 N.E.2d 998, 1000 (Ind. Ct. App. 1999), trans. denied). Catholic Charities contends that the Kramers' claimed damages, which stem from the discovery of R.M.'s registration weeks after E. had been placed with them, were inherent in the nature of the pre-adoption placement. Indeed, Catholic Charities states, the Kramers explicitly knew of that risk and went ahead with the placement despite that knowledge.

But the inherent nature of the activity exception does not apply, and a specific release from negligence is required, where "'the risk of harm is a latent danger'" such as "'the defendant's own negligence.'" See Anderson, 852 N.E.2d at 581 (quoting Marsh, 707 N.E.2d at 1000). For example, in Marsh, the plaintiff was injured when he was thrown fifteen feet into the air during a wind tunnel ride which was supposed to have

6

involved levitating only three to four feet off of the ground. The release the plaintiff had signed did not specifically refer to the defendant's own negligence, and we concluded that the risk of falling from a height of fifteen feet was not inherent in the nature of a wind tunnel ride. Marsh, 707 N.E.2d at 1001. Thus, we held that the trial court erred when it entered summary judgment in favor of the defendant based upon the release signed by the plaintiff.

Here, the Kramers designated evidence that Catholic Charities had a policy of checking the putative father registry twice before placing a child with a pre-adoptive family. And the Kramers contend that Catholic Charities was negligent when it did not comply with that policy before placing E. with them. While there was risk inherent in the nature of the placement, we hold that the risk that Catholic Charities would not comply with its policy to check the putative father registry twice before a pre-adoptive placement was not inherent in the nature of the placement.[2] This policy was unknown to the Kramers at the time they worked with Catholic Charities and, at best, Catholic Charities' failure to comply with this policy presented a latent risk to the Kramers. The trial court erred when it concluded that the releases signed by the Kramers barred their negligence claims as a matter of law.

Next, the Kramers contend that Catholic Charities has not sustained its burden on summary judgment with regard to their negligence claims. Again, the moving party bears the burden of making a prima facie showing that there are no genuine issues of

---

[2] To be clear, while the Kramers obviously understood and accepted the risk that E.'s father could register as late as thirty days after E.'s birth and agreed to hold Catholic Charities harmless in the event that that occurred in the absence of negligence, the release did not cover the risk of Catholic Charities' alleged negligence in failing to timely check the putative father registry in accordance with its practice.

material fact and that the movant is entitled to judgment as a matter of law; and once the movant satisfies the burden, the burden then shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact. Dreaded, Inc., 904 N.E.2d at 1270. The essential elements for a negligence action are (1) a duty owed to the plaintiff by the defendant, (2) a breach of the duty, and (3) an injury proximately caused by the breach of duty. Pfenning v. Lineman, 947 N.E.2d 392, 398 (Ind. 2011).

Here, Catholic Charities limited its motion for summary judgment to the question of breach of duty, and it did not address the elements of duty or proximate cause. On the issue of breach, Catholic Charities argued only that it "breached no duty to the Kramers" because it "fully complied with the mandate of" Indiana Code Section 31-19-5-15(b)(1), which requires an adoption agency to search the putative father registry at least one day after a putative father is required to register with the ISDH.[3] Appellants' App. at 53. But, as the Kramers point out, it is well settled that,

---

[3] Indiana Code Section 31-19-5-12 provides:

> (a) To be entitled to notice of an adoption under IC 31-19-3 or IC 31-19-4, a putative father must register with the state department of health under section 5 of this chapter not later than:
>
> (1) thirty (30) days after the child's birth; or
>
> (2) the earlier of the date of the filing of a petition for the:
>
> > (A) child's adoption; or
> >
> > (B) termination of the parent-child relationship between the child and the child's mother;
>
> whichever occurs later.

8

> [w]here the unjustified or unexcused violation of a duty prescribed by statute may constitute negligence per se, see French v. Bristol Myers Co., 574 N.E.2d 940 (Ind. Ct. App. 1991), trans. denied, it does not follow that compliance with a statute or ordinance constitutes the exercise of reasonable care. W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser & Keeton on the Law of Torts § 36, p. 233 (5th ed. 1984). "While compliance with a statutory standard is evidence of due care, it is not conclusive on the issue. Such standard is no more than a minimum, and it does not necessarily preclude a finding that the actor was negligent in failing to take additional precautions." Id.; see also Restatement (Second) of Torts § 288C (1965).

See Northern Ind. Pub. Serv. Co. v. Sell, 597 N.E.2d 329, 331 (Ind. Ct. App. 1992), trans. denied. Thus, Catholic Charities' only argument as to why it did not breach its duty must fail as a matter of law.[4]

Catholic Charities raises two issues for the first time on appeal, namely, whether its alleged negligence proximately caused the Kramers' damages and whether their claims are barred by the doctrine of incurred risk.[5] Because Catholic Charities did not present either of those issues to the trial court, both issues are waived. See KOA Properties LLC v. Matheison, 984 N.E.2d 1255, 1258 (Ind. Ct. App. 2013), trans. denied. Catholic Charities did not meet its burden on summary judgment and the burden did not shift to the Kramers to demonstrate the existence of a genuine issue of material fact. See Dreaded, Inc., 904 N.E.2d at 1270. We hold that the trial court erred when it entered summary judgment in favor of Catholic Charities.

---

[4] We note that, during the summary judgment hearing, Catholic Charities acknowledged that "whether or not [Catholic Charities] ha[d] a duty [to check the registry any earlier than it did] is certainly unclear." Transcript at 10.

[5] On the issue of proximate cause, we note that the trial court erred when it found that an earlier check of the putative father registry would not have revealed R.M.'s registration as a matter of law. This is a question of fact, and more than one reasonable inference can be drawn from the evidence on this question. For instance, the lack of a result after the first search might have been due to a computer glitch or human error that may not have occurred on another occasion.

9

## Conclusion

We hold that the releases executed by the Kramers do not bar their claims because they do not explicitly contemplate Catholic Charities' negligence. Further, the risk of Catholic Charities' negligence in not checking the putative father registry prior to placement was not inherent in the pre-adoptive placement. In support of its summary judgment motion, Catholic Charities did not satisfy its burden to make a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Thus, the burden to prove the existence of a genuine issue of material fact did not shift to the Kramers. The trial court erred when it entered summary judgment in favor of Catholic Charities.

Reversed and remanded for further proceedings.

CRONE, J., concurs.

BAKER, J., dissents with separate opinion.

10

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JASON AND JUSTINA KRAMER, | ) | |
| | ) | |
| Appellants-Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 71A03-1308-CT-301 |
| | ) | |
| CATHOLIC CHARITIES OF THE DIOCESE OF | ) | |
| FORT WAYNE-SOUTH BEND, INC., | ) | |
| | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

**BAKER, Judge, dissenting.**

I respectfully dissent with the majority's conclusion that the trial court erred in entering summary judgment for Catholic Charities. In my view, Catholic Charities satisfied its burden and made a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.

In accordance with Indiana Code section 31-19-5-15, Catholic Charities could check the putative-father registry at any time, and when the agency worked with M.S., there was no written policy to check the putative-father registry prior to a child's birth. Appellant's App. p. 155. Rather, Catholic Charities's written policy merely required it to check the registry one day after the deadline that a

11

putative father had to register. Id. at 154-55. In practice, Catholic Charities would check the registry when a birth mother first contacted the agency and again just before the birth. While it may indeed be the better policy for an adoption agency to check the registry before the child is actually placed with the adoptive parents, our statutes do not impose such a requirement.[6]

As the majority points out, it was determined that as far as Catholic Charities knew as of May 25, no one had registered as the child's putative father. In other words, the first time that Catholic Charities checked the registry after M.S. had her baby, the agency was informed that no father had registered. Appellants' App. p. 85. A check was performed and nothing was found, even though the father had registered almost one month earlier. Id. at 90.

It was not until Catholic Charities requested a second search on June 1, 2010, that the agency learned someone had indeed registered as the child's putative father. Slip op. at 4. The registration was signed on April 27, 2010, and there was no explanation why the search on May 25 did not reveal the father's registration.

Perhaps the reasonable inference is that the registration document executed by the putative father had not been properly filed until after the first search was conducted. Hence, no prior search by Catholic Charities would have found the

---

[6] As the majority points out, Indiana Code section 31-19-5-12 provides that the putative father has up to thirty days after the child's birth to fill out a form that includes the mother's name and file it with the Indiana State Department of Health. Under Indiana Code section 31-19-5-18, a father who fails to register as above, loses his right to notice of adoption proceedings and impliedly consents to the adoption. However, the statutes do not preclude a putative father from performing the registration process set forth above prior to the child's birth.

putative father. And if an earlier check would not have found the father's registration, the Kramers would have accepted the child even if Catholic Charities had checked the registry before placing the baby with them. In any event, it is undisputed that the father registered before the child was born, and there is no showing that Catholic Charities's failure to check the registry proximately caused any alleged injuries to the Kramers.

I also note that the release that the Kramers signed nonetheless establishes that they understood that the child's father could claim the baby even after he or she had been placed with them. In other words, the Kramers were notified that the placement was "at risk" because, as pointed out above, our adoption statutes provide biological parents time to reconsider or come forward after the child is born. I.C. § 31-19-5-12. Of course, the Kramers knew that they might bond with the child and still have to give the baby to the father. Indeed, even if Catholic Charities had checked the putative father registry every day from the day that the child was born, such a risk would not have been eliminated. Simply put, the Kramers were expressly aware that the father might appear whether Catholic Charities checked the registry or not.

It is also my view that a "registry check" is not a proper duty to be imposed. Insofar as I have alluded to above, the placement would remain risky. The father could register at a later date and claim the child in accordance with the relevant statutes. The designated evidence demonstrates that Catholic Charities discussed

13

this possibility with the Kramers even before they knew that a birth mother was interested in placing her child with them. Appellant's App. p. 120. By accepting the placement despite its risks, the Kramers had the opportunity to begin bonding with what was likely to be their child almost from the moment at birth.

Finally, I agree with the notion advanced by Catholic Charities that permitting adoption agencies to avoid liability for a parent enforcing his parental rights through no effort of the agency is for the public good. Agencies can keep their costs down and focus their attention on serving pregnant women and families seeking to provide good homes for children. The release/agreement that the Kramers signed permits adoption agencies to continue to serve the public without fear of being blamed whenever a birth mother changes her mind or a putative father appears at the last minute.

Even more compelling, such goals can be accomplished without permitting agencies to totally avoid liability if and when they engage in truly wrongful behavior.[7] But those circumstances are not present here. Again, the Kramers knew almost from the beginning of the adoption process that a putative father could register up to thirty days after a child is born and take the baby despite the child's placement for adoption. In other words, the designated evidence established that the Kramers had actual knowledge of this risk. A pre-placement check would have merely indicated that no man had registered as the baby's putative father.

---

[7] Such an example might occur if an adoption agency had actual knowledge that the baby's father had registered but the prospective adoptive parents were not informed of this fact.

For the reasons set forth above, I believe that the trial court properly determined that the Kramers's negligence claims against Catholic Charities are barred. Thus, I would affirm the trial court's grant of summary judgment in favor of Catholic Charities.