**Amelia R. BAUMGART, a minor, BY her Natural Parents and Next Friends, Kenneth C. BAUMGART and Janella S. Baumgart and Kenneth C. Baumgart and Janelle S. Baumgart, Individually, Appellants–Plaintiffs,**

v.

**Roy A. DEFRIES, M.D., and John M. Reid, M.D., Appellees–Defendants.**

v.

**James Atterholt, Commissioner of the Indiana Department of Insurance, Administrator of the Indiana Patient's Compensation Fund, Intervenor–Respondent.**

**No. 82A04–0605–CV–256.**

Court of Appeals of Indiana.

March 20, 2008.

Publication Ordered April 17, 2008.

Ronald Warrum, H. Wayne Turpin, Evansville, IN, Attorneys for Appellants.

David C. Jensen, David J. Beach, Eichhorn & Eichhorn, LLP, Hammond, IN, Attorneys for Appellee Roy A. DeFries, M.D.

Fred S. White, Bamberger, Foreman, Oswald and Hahn, LLP, Evansville, IN, Attorney for Appellee John M. Reid, M.D.

Matthew W. Conner, Tabbert Hahn Earnest & Weddle, LLP, Indianapolis, IN, Attorney for Intervenor James Atterholt.

## OPINION

VAIDIK, Judge.

### Case Summary

A jury awarded Janella and Kenneth Baumgart $6.2 million in damages for the suffering of their daughter, Amelia, their emotional distress related to her injuries, and Amelia's wrongful death, all stemming from medical malpractice occurring during Amelia's 1990 birth. However, the trial court reduced the judgment to $750,000 plus prejudgment interest and attorneys' fees after determining that the Baumgarts could recover for Amelia's wrongful death but not her suffering during life and that their total damages award is capped at $750,000 under the Medical Malpractice Act ("MMA"). The Baumgarts appeal, arguing (1) that the trial court erred in allowing a recovery for wrongful death but no recovery on their survivorship claim, (2) that the awards for negligent infliction of emotional distress and for wrongful death are not limited to a combined award of $750,000, (3) that the trial court erred in refusing two jury instructions, and (4) that the trial court erred in awarding prejudgment interest based upon the portion of the judgment for which Dr. Roy DeFries, the physician attending Amelia's birth, is liable, rather than upon the entire judgment. Dr. DeFries cross-appeals, arguing that the trial court erroneously determined that the Baumgarts satisfied the procedural prerequisites for an award of prejudg-

ment interest and attorneys' fees. Finding that the Baumgarts can not recover on both their survivorship and wrongful death claims, that the MMA's damages cap applies to limit the Baumgart's recovery, that the trial court did not err in refusing two jury instructions and in awarding attorneys' fees to the Baumgarts, and that the Baumgarts did not satisfy the procedural requirements for an award of prejudgment interest, we affirm in part and reverse in part.

### Facts and Procedural History[1]

In late August 1990, Janella and Kenneth were awaiting the birth of their first child, Amelia, whose expected due date was August 25. In the early morning hours of September 4, 1990, Janella was admitted as a patient to Deaconess Hospital in Evansville, Indiana, after she began experiencing contractions. Dr. DeFries, Janella's physician, first saw Janella at 8:20 a.m. that morning. The artificial rupture of membranes at that time revealed possible meconium staining[2] and only a small amount of fluid. Pitocin was added to Janella's intravenous drip, which was meant to "normalize the contractions and bring them closer together which advances the labor better usually." Tr. p. 268. Labor was allowed to progress, and, at 12:04 p.m., the maternal-fetal monitor detected a deceleration of Amelia's heart rate, and a large amount of meconium was expelled. At that point, someone from the hospital called Dr. DeFries at his office to alert him

of the situation. The labor and delivery nurse then applied an internal fetal monitor to assess Amelia's well-being and administered intravenous fluids to Janella. Janella's Pitocin drip was turned off "to see if that might improve the decelerations or the heart rate drop" because the use of Pitocin "can cause" those complications. *Id.* at 270–71.

At approximately 1:15 p.m., Dr. DeFries returned to the hospital and examined Janella for a second time. Because of the deceleration in fetal heart rate at 12:04, he requested a consultation from Dr. John Reid, an obstetrician-gynecologist, spoke with Dr. Miles Grant, a neonatologist, and asked an anesthesiologist to place an epidural. Decelerations of Amelia's heart rate occurred again at around 1:35 and 1:50 p.m., Tr. p. 120, and Dr. DeFries noted that they took place "on about every fourth contraction," Appellants' App. p. 182. Dr. Reid came to the labor and delivery room at 2:13 p.m. to check the readings from the fetal heart monitor and recommended that "they go ahead and get her delivered," Tr. p. 437, which "meant to have an instrument delivery," *id.* at 440. At around 2:30 p.m., Dr. DeFries discovered that Amelia's position was occiput posterior, or face up, a position which sometimes renders a baby undeliverable. Appellants' App. p. 284. After determining that instruments were necessary to assist the delivery, Dr. DeFries applied a vacuum extractor to Amelia's head and at-

---

1. We hereby deny Dr. DeFries's Motion to Strike Family Photos and DVD from Baumgarts' Supplemental Appendix, filed on October 17, 2007. Dr. DeFries cites no authority for excluding these materials. The materials he seeks to strike were in evidence before the trial court and are therefore part of the record on appeal. Ind. Appellate Rules 2(K), 2(L), 29.

2. "Meconium" is "the medical term for [a] newborn infant's first stools." http://www.n

lm.nih.gov/medlineplus/ency/article/002262.htm. "In some cases, the baby passes stools (meconium) while still inside the uterus. This usually happens when the baby is under stress. Once the meconium is passed into the amniotic fluid, it is possible for the baby to breathe the meconium into his [or her] lungs. This condition is called meconium aspiration and can cause inflammation in the baby's lungs. . . ." *Id.*

tempted to rotate her. *Id.* Amelia's heart rate began to drop, and by the time Dr. DeFries stopped using the vacuum extractor at approximately 2:50 p.m., her heart rate was in the sixties. Tr. p. 190–92. He then applied forceps to Amelia's head in an attempt to facilitate delivery, but his attempt was unsuccessful. *Id.* at 195. Dr. Reid arrived at the labor and delivery room at 3:05 p.m. and delivered Amelia at 3:07 p.m. with the use of forceps. *Id.* at 210.

At the time of her birth, Amelia was not breathing, her heart rate was thirty beats per minute, she did not move, and her skin was blue. *Id.* at 212, 223. Although meconium was not present in her airway, her umbilical cord and fingernails were meconium-stained. Appellants' App. p. 183. Artificial resuscitation efforts using an ambu bag[3] raised Amelia's heart rate, and Dr. DeFries placed an endotracheal tube[4] into her airway approximately three to four minutes after her birth in an effort to deliver more oxygen. Tr. p. 216. The tube, however, was misplaced, and the anesthesiologist, who was present for the delivery, reintubated Amelia. *Id.* at 220. Once Dr. Grant arrived eighteen minutes after Amelia's birth, he reintubated her because the tube was in the "wrong position." *Id.* at 307. Amelia was then transferred to the neonatal unit at St. Mary's Hospital, where she was subsequently diagnosed with cerebral palsy with spastic quadriplegia. *Id.* at 483. Dr. Grant, who treated Amelia at St. Mary's Hospital, determined that she had suffered "[s]evere perinatal depression . . . [a]t or around the

time of birth." *Id.* at 299. Her skull was also fractured. *Id.* at 566.

During the delivery, Janella also sustained various injuries. After Amelia was born, Dr. Reid and another physician tended to Janella's injuries. A later count of the sponges used during the reparative procedures revealed that a sponge was missing. Janella's physicians anticipated that the sponge was inadvertently left "in the top of [her] vagina." Appellants' App. p. 166. The sponge was removed using ring forceps on September 6, 1990.

Amelia's condition did not improve with treatment. Her brain injury caused severe mental retardation and spastic quadriplegia. *See* Plaintiffs' Ex. 53, Record Dated 12/16/95. She suffered "chronic ongoing problems with reactive airway disease and recurrent chronic bronchitis" and required a feeding tube and round-the-clock care. *Id.* In addition, she could not "verbally or visually respond to any kind of testing." Tr. p. 891. From the time of her initial release from St. Mary's Hospital on October 14, 1990, Janella and Kenneth cared for Amelia at home, adhering to a rigorous care schedule. Amelia's illnesses required numerous hospitalizations, and, on February 12, 2005, almost fourteen-and-one-half years after her birth, Amelia passed away. Her cause of death was aspiration pneumonia secondary to her spastic quadriplegia. *Id.* at 902; *see also id.* at 699; Plaintiffs' Ex. 53, Record Dated 2/12/05. Amelia's treating physicians at the time of her death testified at trial that her lifelong medical problems were the

---

**3.** At trial, Dr. DeFries explained that an ambu bag is "a bag with a little mask over it and you put that on the face and just start breathing for the baby." Tr. p. 214.

**4.** At trial, Dr. DeFries described an endotracheal tube as follows: "It's a tube that you put down through the mouth in through the

vocal cords . . . and into the trachea and the reason for doing that is you're getting oxygen directly into the lungs and you're not having to worry about the space between the mouth and the lungs getting blocked or plugged with mucus. So it's a much more efficient way to oxygenate the baby." Tr. p. 217.

result of injuries sustained at birth. Tr. p. 701–02, 889.

Pursuant to Indiana's Medical Malpractice Act, sometime prior to March 29, 1994,[5] the Baumgarts initially filed a complaint with the Medical Review Panel of the Indiana Department of Insurance. Ind.Code § 16–9.5–9–2(a) (1988).[6] In their complaint, they alleged that Dr. DeFries, Dr. Reid, and Deaconess Hospital failed to provide the appropriate standard of care for Amelia and Janella and that their negligence caused injuries to Amelia and Janella. On January 31, 2001, the Medical Review Panel unanimously found that Dr. DeFries and Dr. Reid "failed to comply with the appropriate standard of care" and that this was a factor of Amelia's suffering and the resultant suffering of her parents. Appellants' App. p. 158. The Panel found that although "Deaconess Hospital failed to meet the applicable standard of care" regarding the treatment of Amelia, "[t]he conduct complained of was not a factor of the resultant damages." Id. Finally, the Panel concluded that the defendants met the appropriate standard of care in their medical treatment of Janella during and after Amelia's delivery. Id.

Thereafter, on May 18, 2001, the Baumgarts filed suit in Vanderburgh Circuit Court on behalf of themselves and Amelia. They alleged that the defendants' actions harmed Amelia such that she was entitled to damages (Count I), that the defendants negligently injured Janella during and after Amelia's birth (Count II), that Janella and Kenneth were entitled to damages for their emotional pain arising out of Amelia's injuries (Count III), and that Kenneth suffered a loss of consortium due to the defendants' negligent treatment of Janella (Count IV). Id. at 34–35. After Amelia's death, the Baumgarts added Count V, a wrongful death allegation, in which they argued that Amelia died "as the direct and proximate result of the negligent acts and omissions of the defendants." Id. at 37. The trial court subsequently granted summary judgment in favor of Deaconess Hospital. Id. at 21.

In 2005, the case proceeded to jury trial. Pursuant to the jury's verdict, on November 22, 2005, the trial court entered judgment against Dr. DeFries on Count I in the amount of $3,000,000, against Dr. DeFries on Count III in the amount of $2,500,000, and against Dr. DeFries on Count V in the amount of $700,000. Id. at 82–83. The court entered judgment against the Baumgarts on Counts II and IV and did not enter judgment against Dr. Reid on any of the counts. Id. The court awarded the Baumgarts costs against Dr. DeFries. Id. at 83. Subsequently, the Commissioner of the Indiana Department of Insurance, as Administrator of the Indiana Patient's Compensation Fund, moved to intervene, which the trial court permitted.[7] The Commissioner and Dr. DeFries then filed motions to correct errors. After a hearing, the trial court granted the motions to correct errors and issued an amended judgment, vacating the award on Count I (malpractice against Amelia causing injuries) and reducing the

---

5. The Baumgarts' submission to the Medical Review Panel, designated as Plaintiffs' Ex. 1 in the record, is undated. However, Dr. DeFries's response to the complaint is dated March 29, 1994. Plaintiffs' Ex. 6.

6. In 1990, at the time of Amelia's injury, the MMA was codified at Indiana Code §§ 16–9.5–1–1 to 16–9.5–10–5. It was later codified at Indiana Code §§ 27–12–1–1 to 27–12–18–2.

In 1998, the MMA was recodified at its present location at Indiana Code §§ 34–18–1–1 to 34–18–18–2.

7. The Commissioner had standing to intervene pursuant to Indiana Trial Rule 24(C) for the purposes of seeking relief from the trial court's judgment under Trial Rules 50 and 59.

award on Count III (the Baumgarts' emotional distress) to $50,000. *Id.* at 131–32, 135–36. The jury's verdict and $700,000 award on Count V (malpractice causing Amelia's wrongful death) remained intact. The amended judgment awarded $1000 in attorneys' fees, costs, and expenses and $40,000 in prejudgment interest to the Baumgarts. *Id.* at 136. This appeal ensued.

## Discussion and Decision

The Baumgarts appeal, raising a number of issues, which we restate as: (1) whether the trial court erred in allowing a recovery against Dr. DeFries for Amelia's wrongful death but no recovery on their survivorship claim, (2) whether the awards for negligent infliction of emotional distress and for wrongful death are limited to a combined award of $750,000, (3) whether the trial court erred in refusing jury instructions regarding a physician's non-delegable duty to remove sponges after surgeries and informed consent, and (4) whether the trial court erred in awarding prejudgment interest based upon the $100,000 portion of the judgment for which Dr. DeFries is liable. Dr. DeFries cross-appeals, arguing that the trial court erroneously determined that the Baumgarts satisfied the procedural prerequisites for an award of prejudgment interest and attorneys' fees and expenses.[8] We address each issue in turn.

## I. STANDARD OF REVIEW

The Baumgarts appeal the trial court's grant of the motions to correct error, its earlier rejection of two jury instructions during trial, and its computation of prejudgment interest, and Dr. DeFries cross-appeals the trial court's award of prejudgment interest and attorneys' fees and expenses. We review each of these rulings for abuse of discretion. *Super-*

*vised Estate of Williamson v. Williamson,* 798 N.E.2d 238, 241 (Ind.Ct.App.2003) (rulings on a motion to correct error subject to abuse of discretion review); *Stowers v. Clinton Cent. Sch. Corp.,* 855 N.E.2d 739, 749 (Ind.Ct.App.2006) (rejection of a jury instruction reviewed for abuse of discretion), *trans. denied; Thor Elec., Inc. v. Oberle & Assoc., Inc.,* 741 N.E.2d 373, 377 (Ind.Ct.App.2000) (award of prejudgment interest reviewed for abuse of discretion); *Benaugh v. Garner,* 876 N.E.2d 344, 347 (Ind.Ct.App.2007) (award of attorney's fees reviewed for abuse of discretion). An abuse of discretion occurs if the trial court's decision was against the logic and effect of the facts and circumstances before the court. *Williamson,* 798 N.E.2d at 241. Where a question of law is involved, our standard of review is *de novo. Young v. Ind. Dep't of Natural Res.,* 789 N.E.2d 550, 554 (Ind.Ct.App.2003), *trans. denied.*

## II. Survivorship Claim

The Baumgarts first argue that the trial court erred in allowing a recovery against Dr. DeFries for Amelia's wrongful death but no recovery on their survivorship claim (Count I). In Count I of their original complaint filed with the trial court, the Baumgarts alleged that as a result of negligence by the defendants, Amelia suffered injuries and would require "professional care, treatment and hospitalizations for the remainder of her life ... and [would] have anguish and pain and suffering forever." Appellants' App. p. 33. Thus, the complaint demanded judgment "in an amount sufficient to compensate the plaintiff, Amelia R. Baumgart, a Minor, for her injuries, damages, loss of income, medical expenses, costs of th[e] action, and for all other proper relief in the premises." *Id.* After Amelia subsequently died, the Baumgarts added Count V, alleging that Amelia's

---

8. Dr. DeFries, Dr. Reid, and the Commission- er each filed an appellee's brief.

death resulted from the defendants' negligence. *Id.* at 37. After adding Count V, they maintained their demand for an award of damages under Count I. Although the trial court initially entered judgment in favor of the Baumgarts on both Counts I and V, it later granted the defendants' motions to correct error and entered an amended judgment vacating the judgment on Count I. The trial court explained that it did so because

> Count I is a Survival action. Count V, under which Plaintiffs Kenneth and Janella Baumgart recovered judgment against Defendant DeFries, is a Wrongful Death action. A defendant may be held liable under a Wrongful Death claim or a Survival claim, but not both. Since the evidence at trial was that Amelia Baumgart died as a result of the injuries she sustained due to the alleged negligence of Defendant DeFries, there can be a recovery under Count V, but not under Count I.

*Id.* at 130 (citations omitted). We agree with the trial court.

■ The MMA provides the procedural framework for the prosecution of medical malpractice claims in Indiana.[9] *Ellenwine v. Fairley,* 846 N.E.2d 657, 660 (Ind.2006). It provides the mechanism for legal relief for a patient or a representative of a patient who suffers bodily injury or death as a result of medical malpractice. *See* Ind. Code § 16-9.5-1-6 (1988). However, there are limitations to the time frame during which a patient or representative can bring such a claim, not only under the MMA's statute of limitations, *see* Ind.Code § 16-9.5-3-1 (1988), but also under Indiana's Survival Act, *see* Ind.Code §§ 34-1-1-1 (Supp.1990).[10] Indiana Code

§ 34-1-1-1(a) (Supp.1990), provides, in relevant part:

> All causes of action survive, and may be b[r]ought, notwithstanding the death of the individual who is entitled or liable in such an action, by or against the representative of the deceased party except actions for libel, slander, malicious prosecution, false imprisonment, invasion of privacy, and *personal injuries to the deceased party,* which shall survive only to the extent provided herein.

(Emphasis added). It is settled that "personal injuries" in the context of this statute include medical malpractice claims. *Ellenwine,* 846 N.E.2d at 661; *see Goleski v. Fritz,* 768 N.E.2d 889, 891–92 (Ind. 2002). The exception to the rule that the cause of action dies with the victim of medical malpractice is where that person "subsequently dies from causes other than those personal injuries." I.C. § 34-1-1-1(d) (Supp.1990). In such a case, "[t]he personal representative of the decedent who was injured may maintain an action against the wrongdoer to recover all damages resulting before the date of death from those injuries that the decedent would have been entitled to recover had the decedent lived." *Id.*

■ The relevant question, then, is whether Amelia passed away from causes other than the personal injuries she sustained due to medical malpractice. This is a question of fact that was answered by the verdict of the jury and the trial court's subsequent clarification. The Baumgarts' Count V, added after Amelia's death to include a claim under the Child Wrongful Death Act, Ind.Code ch. 34-23-2, specifically alleges that Amelia died "as the direct and proximate result of the negligent acts and omissions of the defendants."

**9.** Indiana Code §§ 16–9.5–1–1 to 16–9.5–10–5 (1988). *See supra* note 6.

**10.** The Survival Act is presently codified at Indiana Code § 34-9-3-1, –4.

Appellants' App. p. 37. Thus, the argument made by the Baumgarts to the trial court was precisely that Amelia's death resulted from the defendants' malpractice. In *Ellenwine*, our Supreme Court addressed such a situation and found that the Survival Act dictated that the parents' medical malpractice claim did not survive their child's death: "Here the Ellenwines affirmatively contend that the injuries that form the basis of the alleged malpractice caused Dustin's death. As such, the Survival Act mandates that the medical malpractice claim does not survive Dustin's death and may not be brought." *Ellenwine*, 846 N.E.2d at 661. Rather, the appropriate recovery in a case where a child is injured by medical malpractice and later dies as a result is under the Child Wrongful Death Act, and the law in this state is clear that "[t]he survival statute precludes recovery on both a wrongful death claim and a survival claim." *Cahoon v. Cummings*, 734 N.E.2d 535, 544 (Ind.2000).

On appeal, the Baumgarts counter that "in the jury's eyes there was evidence to support the survival claim, the claim that Dr. DeFries had committed more than one act of negligence, some of which injured Amelia but did not cause her death, and at least one of which that did cause Amelia's death." Appellants' Br. p. 17. They argue that "[f]rom the evidence the jury was justified in finding that Dr. DeFries committed separate acts of negligence at or about 12:04, 12:40, 1:15, 1:41, 2:13, 2:45 and in his attempts at intubation of Amelia after 3 o'clock, and that each act of negligence caused separate and distinct injuries to Amelia that did not cause her death." *Id.* at 17–18. However, in this case the record does not reflect that the jury found anything but that Dr. DeFries's negligence both injured Amelia and ultimately caused her death. At the conclusion of trial, the court read the following instruction to the jury:

In Count I, Plaintiffs are seeking damages on behalf of Amelia Baumgart for her injuries while living due to the negligence of the Defendants. You may find for or against the Plaintiffs and for or against either or both Defendants in Count I.... In Count V, Plaintiffs are seeking damages for the death of their daughter, Amelia Baumgart, which they allege was caused by the negligent acts of the defendants. You may find for or against the Plaintiffs and for or against either or both Defendants in Count V.

Tr. p. 1844, 1847. Not only is there no indication from the jury that it found sufficiently separate injuries to Amelia to allow the multiple recoveries sought by the plaintiffs, the trial court, in its Order on Motions to Correct Errors, found that the injuries caused by Dr. DeFries's negligence ultimately caused her death. Appellants' App. p. 130. Because the fact-finder in this case determined that the injuries caused by Dr. DeFries ultimately caused Amelia's death, and this conclusion is based upon the evidence presented at trial, as a matter of law the Baumgarts may recover for Amelia's wrongful death but not for Amelia's injuries under their survivorship claim.

## III. Recovery Limitation Under the Medical Malpractice Act

The Baumgarts next contend that their awards for negligent infliction of emotional distress and for Amelia's wrongful death are not limited to a combined award of $750,000 and that the trial court misinterpreted the law in reaching its conclusion that they are. We disagree.

The MMA governs malpractice claims for bodily injury or death and the parameters of the recovery for a claim. It provides that for an act of malpractice on or after January 1, 1990, "The total amount recoverable for any injury or death of a

patient may not exceed ... seven hundred fifty thousand dollars ($750,000)." Ind. Code § 16–9.5–2–2(a) (Supp.1990).[11] The MMA defines "patient" as "an individual who receives or should have received health care from a health care provider ... and includes a person having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice on the part of a health care provider." Ind. Code § 16–9.5–1–1(c) (Supp.1990). "Derivative claims include, but are not limited to, the claim of a parent or parents, guardian, trustee, child, relative, attorney, or any other representative of the patient including claims for loss of services, loss of consortium, expenses, and other similar claims." *Id.*

■ The Baumgarts' argument is essentially that their claims for negligent infliction of emotional distress are not derivative to claims related to Amelia's injuries and death under the MMA and that they are therefore not subject to the recovery cap provided by Indiana Code § 16–9.5–2–2(a) (Supp.1990). While our Supreme Court has determined that derivative claimants are "patients" under the MMA, it has found that "[a]lthough there may be persons who are statutorily defined to be 'patients' and therefore may assert derivative claims for their own damages under the Act, section 34–18–14–3(a) [12] applies to the damages cap to all claims, whoever may assert them, for a single 'injury or death of a patient.' " *Goleski,* 768 N.E.2d at 891 n. 1. The Court clarified, "The only 'injury or death' within the meaning of this section is the injury or death suffered by the actual victim of the malpractice." *Id.* Thus, under *Goleski,* if a claim for negli-

gent infliction of emotional distress is a derivative claim under the MMA, the recovery cap provided by Indiana Code § 16–9.5–2–2(a) (Supp.1990) limits the recovery available for emotional distress in addition to any other recovery flowing from the injury or death of the actual victim of the malpractice.

Another panel of this Court recently addressed this precise issue and concluded that, *within the context of the MMA,* negligent infliction of emotional distress claims are derivative in nature. *Ind. Patient's Comp. Fund v. Winkle,* 863 N.E.2d 1, 7–8 (Ind.Ct.App.2007), *reh'g denied, trans. denied.* The Court reasoned:

> [T]he Act defines a derivative claim as including 'the claim of a parent or parents, guardian, trustee, child, relative, attorney, or any other representative of the patient including claims for loss of services, loss of consortium, expenses, *and other similar claims.* Ind.Code § 34–18–2–22 (emphasis added). Although, as we have held, negligent infliction of emotional distress is an independent tort, we are bound by precedent and the rules of statutory construction to conclude that such a claim, when made under the Act, falls under the Act's definition of 'derivative claim.' For instance, in interpreting the damages cap in Indiana Code section 34–18–14–3(a), our supreme court held that 'only 'injury or death' within the meaning of this section is the injury or death suffered by the *actual victim of the malpractice.' Goleski,* 768 N.E.2d at 891 n. 1 (emphasis added). Given that clear statement of the law ... we must hold that [the plaintiffs'] negligent infliction

---

**11.** Under the present version of the MMA, the $750,000 cap applies to "an act of malpractice that occur[ed]: (A) after December 31, 1989; and (B) before July 1, 1999." Ind. Code § 34–18–14–3(a)(2).

**12.** Previously I.C. § 16–9.5–2–2(a) (Supp. 1990).

of emotional distress claims constitute 'derivative claims' as defined in Indiana Code section 34–18–2–22. As such, there must be a patient from whom their claims can derive. Although this court has held that if there is more than one actual victim of the malpractice, each injured person can obtain excess damages, *see McCarty v. Sanders,* 805 N.E.2d 894, 899–900 (Ind.Ct.App.2004), *trans. denied,* the nature of the injury alleged by the [plaintiffs] in light of the Act's definition of a derivative claim limits the recovery here.

*Id.* On the same day we issued *Winkle,* a separate panel of this Court issued another opinion following this rule. In *Indiana Patient's Compensation Fund v. Butcher,* 863 N.E.2d 11 (Ind.Ct.App.2007), the parents of a child who died after his birth filed suit for the child's wrongful death, the injuries to the mother during an emergency cesarean section, and both parents' emotional distress relating to the alleged malpractice. In determining whether the parents' emotional distress damages were subject to their own caps or their child's cap, the Court found that the parents, "individually and on behalf of [the child], have valid claims for which they may be entitled to recover, that recovery is limited to the statutorily-dictated cap for 'the injury or death suffered by the actual victim of the malpractice.' Here, the actual victim of the malpractice is [the child]." *Id.* at 16 (quoting *Goleski,* 768 N.E.2d at 891 n. 1). In this case, neither Janella nor Kenneth was an actual victim of the malpractice,[13] and therefore they may not recover under their own statutory caps. Thus, any recovery awarded pursuant to their emotion-

al distress claims cannot, combined with other awards stemming from malpractice suffered by Amelia, exceed $750,000. I.C. § 16–9.5–2–2(a) (Supp.1990). We decline the Baumgarts' invitation to revisit this issue and to overrule *Winkle* and *Butcher.*

## IV. Jury Instructions

Next, the Baumgarts argue that the trial court erred in refusing two jury instructions. Specifically, they contend that the trial court should have given instructions pertaining to a physician's non-delegable duty to remove sponges used in an operation and a patient's right to informed decision-making. We address both in turn.

### A. Non–Delegable Duty Instruction

The Baumgarts tendered the following proposed jury instruction to the trial court, which the trial court refused: "In performing an operation a physician has a duty to the patient to remove sponges and cannot delegate that duty." Tr. p. 1893. On appeal, they argue that the trial court abused its discretion in refusing this instruction. We will only reverse a trial court's decision to reject a jury instruction if "(1) the instruction is a correct statement of the law; (2) it is supported by the evidence; (3) it does not repeat material adequately covered by other instructions; and (4) the substantial rights of the tendering party would be prejudiced by the failure to give the instruction." *Stowers,* 855 N.E.2d at 749 (citation omitted).

The tendered instruction comes directly from Indiana Pattern Jury Instruction No. 23.03, which we have described as a "captain of the ship" instruction. *Miller v. Ryan,* 706 N.E.2d 244, 250 (Ind.Ct.App.

---

**13.** The jury found in favor of the defendants on Count II, which alleged that the doctors committed malpractice against Janella, and on Count IV, Kenneth's loss of consortium claim. In their appellate brief, the Baumgarts explain their claim for emotional dis-

tress as such: "Janella seeks to recover for her emotional distress *as a result of Amelia's injuries.* Kenneth also seeks to recover for his emotional distress *as a result of Amelia's injuries.*" Appellants' Br. p. 24.

1999), *trans. denied.* It is a correct statement of the law. *See Ho v. Frye,* 880 N.E.2d 1192, 1200 (Ind.2008) ("As held in *Funk,* a surgeon may not escape his responsibility to remove sponges used during the surgery simply by delegating responsibility for tracking surgical sponges to attending nurses."); *Funk v. Bonham,* 204 Ind. 170, 183 N.E. 312, 316 (1932); *Miller,* 706 N.E.2d at 251. However, in this case, we find that the trial court did not abuse its discretion in refusing to read the instruction to the jury.

■ This instruction embodies two themes. First, the instruction pertains to negligence related to leaving a sponge inside of a patient. Second, the instruction deals with a physician's inability to delegate the duty to remove sponges from patients and thereby avoid liability for negligence. We find that the instruction's first theme is adequately covered by another instruction. Specifically, the trial court read the following final instruction to the jury:

> A physician commits an act of negligence when the physician fails to exercise the degree of reasonable care and skill in providing health care to a patient as would a reasonably careful, skillful and prudent physician acting under the same or similar circumstances. The negligence may consist of doing something that the physician should not have done under the circumstances, or the failure to do something that the physician should have done under the circumstances.

Tr. p. 1852. Informing the jury that "negligence may consist of . . . the failure to do something that the physician should have done under the circumstances," *i.e.,* remove a sponge from Janella, adequately covered the negligence component of the rejected sponge instruction.

■ However, the instruction's second theme was not supported by the evidence. This instruction was clearly directed toward Dr. Reid rather than Dr. DeFries because Dr. DeFries was not involved in Janella's post-delivery treatment during which a sponge was accidentally left inside of her vagina. It deals expressly with a physician's attempt to delegate the duty to remove sponges placed inside of a patient's body during surgery. However, we have examined Dr. Reid's trial testimony and closing argument and can find no indication that he asserted that someone other than himself was ultimately responsible for the missing sponge. Thus, this aspect of the instruction would not have served the purpose of providing the jury with the law applicable to the facts of the case. *See Lee v. Hamilton,* 841 N.E.2d 223, 230 (Ind.Ct. App.2006) ("The purpose of a jury instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair and correct verdict."). The trial court did not abuse its discretion in rejecting this jury instruction.

### B. Informed Consent Instruction

■ The Baumgarts next argue that the trial court abused its discretion in refusing a proposed jury instruction regarding informed consent, as it related to Dr. Reid. The tendered instruction reads: "The patient's decision to undergo a particular treatment must be an informed choice. A physician has a duty to make reasonable disclosure of important facts such as the nature of a proposed treatment; other treatments available, and the risks involved for the patient." Tr. p.1905. The Baumgarts contend that the evidence supported this instruction because "informed consent was an issue. Dr. Reid admitted he never talked with Janella

about a C-section. He had that duty." Appellants' Br. p. 36.

We find that the evidence does not support this tendered instruction. It is clear from the record that Dr. Reid was not Janella's admitting physician and that Dr. DeFries managed her medical care. Dr. Reid was a consulting physician, invited solely to interpret fetal heart tracings by Dr. DeFries. During Dr. Reid's brief encounters with Janella prior to the time of Amelia's delivery, Dr. DeFries was not considering a caesarian delivery. Dr. Reid explained, "[A]t no time was the concept of caesarian delivery discussed [with Dr. De-Fries] because there was no indication that [Janella] needed a caesarian delivery at that time." Tr. p. 488 (reading from his deposition). For this reason, the evidence does not support giving an instruction to the jury that Janella should have been told at that time about the benefits and risks of a caesarian delivery. This instruction is not supported by the evidence. The trial court did not abuse its discretion in refusing this tendered instruction.

### V. Prejudgment Interest, Attorneys' Fees, and Expenses

Finally, the Baumgarts argue that the trial court erred in awarding prejudgment interest based upon the portion of the judgment for which Dr. DeFries is liable, rather than upon the entire judgment. In response, Dr. DeFries argues that the trial court erroneously determined that the Baumgarts satisfied the procedural prerequisites for an award of prejudgment interest and attorneys' fees. As to the issue of prejudgment interest, we find Dr. DeFries's statutory argument dispositive. However, we find that the trial court properly awarded the Baumgarts attorneys' fees in the amount of $1000.

Indiana's Prejudgment Interest Act, Ind.Code ch. 34–51–4,[14] allows a successful litigant to collect prejudgment interest, subject to certain restrictions, *Cahoon,* 734 N.E.2d at 546. The statute provides that a successful plaintiff may not collect prejudgment interest if

(1) within one (1) year after a claim is filed in the court, or any longer period determined by the court to be necessary upon a showing of good cause, the party who filed the claim fails to make a written offer of settlement to the party or parties against whom the claim is filed;

(2) the terms of the offer fail to provide for payment of the settlement offer within sixty (60) days after the offer is accepted; or

(3) the amount of the offer exceeds one and one-third (1 1/3) of the amount of the judgment awarded.

Ind.Code § 34–51–4–6. The Baumgarts filed their claim with the trial court on May 18, 2001. Prior to that date, their claim was before the Medical Review Panel.

 The record reflects that the Baumgarts' first settlement offer, dated July 17, 1996, indicated a willingness to settle but no clear terms. The offer letter contained the following relevant language:

In response to your letter of July 9, 1996, I have every intention of pursuing this case. . . . If your client is wanting to resolve this matter, please be advised that my clients are willing to compromise this claim in any fashion from any or all of the defendants in a manner that would allow them to further pursue this matter with the Indiana Department of Insurance.

---

**14.** The Prejudgment Interest Act was previously codified at Indiana Code § 34–4–37–1 *et seq.* (repealed by P.L. 1–1998).

Appellants' App. p. 110. This settlement offer did not express a particular demand amount. I.C. § 34–51–4–6(3). Nor did it provide for payment within sixty days of the offer's acceptance. I.C. § 34–51–4–6(2). During a hearing on the questions of prejudgment interest and attorneys' fees, the Baumgarts likened their case to *Cahoon*, 734 N.E.2d 535, in which it was held that a written offer to "settle this claim now for $75,001" satisfied the time requirement in Indiana Code § 34–51–4–6(2) because "now" conveyed immediate satisfaction. *Cahoon*, 734 N.E.2d at 547. However, the July 17, 1996, letter contained no such time-limiting language. Therefore, the July 17, 1996, letter did not comply with the requirements of the Prejudgment Interest Act.

The record shows that the Baumgarts made a second written settlement offer on March 9, 2005, beyond the one-year limitation provided in the Prejudgment Interest Act. However, they did not request, nor did they receive, a ruling from the trial court that there was good cause for the delay. Tr. p.2065. Thus, this settlement offer also did not meet the requirements of the Prejudgment Interest Act. Because the plaintiffs did not make a written settlement offer meeting the criteria of the Prejudgment Interest Act, we find that the trial court abused its discretion in awarding them prejudgment interest.

The next question raised by Dr. DeFries is whether the trial court abused its discretion in awarding $1000 in attorneys' fees to the Baumgarts. Indiana Code § 34–50–1–6 provides for the award of attorneys' fees, not to exceed $1000, where a defendant rejects a qualified settlement offer, Ind. Code § 34–50–1–4, and certain other conditions are met. Indiana Code § 34–50–1–6 provides, in part:

(a) If:

(1) a recipient does not accept a qualified settlement offer; and

(2) the final judgment is less favorable to the recipient than the terms of the qualified settlement offer; the court shall award attorney's fees, costs, and expenses to the offeror upon the offeror's motion.

(b) An award of attorney's fees, costs, and expenses under this section must consist of attorney's fees at a rate of not more than one hundred dollars ($100) per hour and other costs and expenses incurred by the offeror after the date of the qualified settlement offer. However, the award of attorney's fees, costs, and expenses may not total more than one thousand dollars ($1,000).

(c) A motion for an award of attorney's fees, costs, and expenses under this section must be filed not more than thirty (30) days after entry of judgment. The motion must be accompanied by an affidavit of the offeror or the offeror's attorney establishing the amount of the attorney's fees and other costs and expenses incurred by the offeror after the date of the qualified settlement offer. The affidavit constitutes prima facie proof of the reasonableness of the amount.

Dr. DeFries argues on appeal that the Baumgarts' counsel's affidavit fails to comply with subsection 6(c) by insufficiently articulating the legal expenses incurred by the Baumgarts. Appellee's Br. (Dr. DeFries) p. 26. Dr. DeFries hones in on the following statement contained in the affidavit submitted in support of attorneys' fees: "[I]t is obvious that counsel for plaintiffs have expended far more tha[n] $1,000 of attorney time." *Id.* (quoting Appellants' App. p. 123). He argues that "[s]etting forth the asserted 'obvious' value of services rendered does not satisfy the requirement of the statute." *Id.* However, the affidavit provides much more relevant

information than that cited by Dr. De-Fries. In explaining the value of legal services provided in this case, the affidavit provides:

> Depositions of both defendants, both plaintiffs, Tom and Mary Baumgart, Roselyn Dixon, and Thomas Poulton, M.D., were taken after May 11, 2005. An eight (8) day jury trial was held in this case, concluding on September 8, 2005. Numerous post-trial motions, briefs, and memoranda have been filed by plaintiffs, Defendant DeFries, the Indiana Department of Insurance, and the State of Indiana. Oral argument has been held on the Motions to Correct Error filed by both Dr. DeFries and the Indiana Department of Insurance.

Appellants' App. p. 122–23. We find that the Baumgarts amply established that they incurred attorneys' fees and expenses in the amount of $1000.

### Conclusion

Finding that the Baumgarts can not recover for both Amelia's survivorship claim and her wrongful death, that the MMA's damages cap applies to limit the Baumgart's recovery, that the trial court did not err in refusing two jury instructions and in awarding attorneys' fees, and that the Baumgarts did not satisfy the procedural requirements for an award of prejudgment interest, we affirm in part and reverse in part. We remand to the trial court for an order not inconsistent with this opinion.

BAKER, C.J., and BAILEY, J., concur.

### *ORDER*

On March 20, 2008, the Court handed down its opinion in this appeal marked Memorandum Decision, Not for Publication. The Appellee Roy A. DeFries, M.D., by counsel, has filed a Motion to Publish Memorandum Decision.

Having considered the matter, the Court FINDS AND ORDERS AS FOLLOWS:

1. The Appellee's Motion to Publish Memorandum Decision is GRANTED and this Court's opinion heretofore handed down in this cause on March 20, 2008, marked Memorandum Decision, Not for Publication is now ORDERED PUBLISHED.

Baker, C.J., Bailey, Vaidik, JJ., concur.

**R.J.G., Appellant–Respondent,**