Gary LEWIS, as Personal Representative of the Estate of Linda S. Lewis, Appellant–Plaintiff,

v.

ESTATE OF Alvis WYNN, Patricia Wynn as Personal Representative of The Estate of Alvin Wynn, and Phyllis Wynn, Appellees–Defendants.

No. 10A01–0804–CV–157.

Court of Appeals of Indiana.

Jan. 30, 2009.

Transfer Denied May 7, 2009.

Micahel Maschmeyer, David Nachand, Jeffersonville, IN, Attorneys for Appellant.

Thomas E. Scifres, Thomas E. Scifres, P.C., Salem, IN, Attorney for Appellee.

## OPINION

MAY, Judge.

On March 29, 2005, Alvis Wynn shot and killed his step-daughter, Linda Lewis and then killed himself. Linda's personal representative, her husband Gary Lewis, filed a wrongful death claim against Alvis' estate and a negligence claim against Phyllis Wynn, who is Linda's mother and Alvis' wife.[1] Gary alleged Phyllis "procured or possessed" the gun used in the shooting and "negligently stored, entrusted, monitored or allowed" Alvis to take possession of it. (Appellant's App. at 12.) Phyllis moved for summary judgment on the negligence claim and on the issue of whether nonprobate transfers to her were subject to claims against Alvis' estate. The trial court granted summary judgment for Phyllis on the negligence claim and held her liability would be limited to the extent Alvis contributed to the accounts that were transferred to her on Alvis' death. We affirm.

## FACTS AND PROCEDURAL HISTORY

Phyllis married Alvis in 1965. According to Phyllis, Alvis was abusive, controlling, manipulative, and had a temper. Phyllis stated Alvis hated women and if he got angry with her or one of her daughters, he would get angry with them all. Around 1980, when Linda was a teenager, she claimed Alvis had raped her, and Phyl-

---

1. According to Gary's brief, Alvis killed himself after shooting Linda. Phyllis' daughter Patricia is the personal representative of Alvis' estate.

lis decided to divorce him. However, Phyllis remarried Alvis three years later.

Alvis' controlling and abusive behavior continued during the second marriage. Phyllis described Alvis as a "very unhappy" person, (*id.* at 86), who had a "real bad temper." (*Id.* at 87.) Phyllis stated Alvis would tell her about once every two months that he wanted to kill her. However, she claimed he never pointed a gun at her or threatened to kill Linda. Alvis began drinking "regularly" at some point during the second marriage, (*id.* at 88), and he was "hateful" when he drank. (*Id.* at 91.) Alvis hit Phyllis on several occasions.

Phyllis filed for divorce again on September 24, 2004. Phyllis and Alvis separated but lived next door to each other. In the days leading up to the separation, Alvis and Phyllis fought nearly every day. Alvis became even angrier after the separation. He had never gotten along with Linda, but he particularly disliked her after the separation because she supported Phyllis getting a divorce. A few months after the separation, Phyllis changed her locks to prevent Alvis from stealing from her.

Phyllis' lawyer advised her to let Alvis remove his personal belongings from her home. She left the house while Alvis was getting his things because she did not want a confrontation with him. Phyllis contends Alvis took all the guns from her household at that time. Phyllis knew he had taken the .38 caliber gun that was later used in the shooting, another handgun, and an automatic rifle she had purchased for him for Christmas sometime in the 1960s. Phyllis denied purchasing the handguns for Alvis. The guns had been kept in a cabinet.

There were two keys to the cabinet; one was kept on top of the cabinet and Alvis kept the second. At some point, Alvis took both keys and would not give one to Phyllis, despite her repeated requests.

Gary filed suit against Phyllis, and Phyllis filed for summary judgment. Opposing Phyllis' motion for summary judgment, Gary designated the affidavit of his son, Jason Lewis. Jason claimed Phyllis told him on more than one occasion that "she was aware that Alvis Wynn was not allowed to purchase or own guns because of his felony conviction for maliciously shooting someone so she bought the guns for Alvis Wynn."[2] (*Id.* at 225.) Jason stated that the .38 caliber handgun was one of the guns Phyllis had purchased for Alvis, and Jason claimed he saw this gun in Phyllis' gun cabinet within a month before the shooting.

## DISCUSSION AND DECISION

When reviewing a summary judgment, we apply the same standard as the trial court: summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Corr v. Am. Family Ins.*, 767 N.E.2d 535, 537 (Ind.2002). All facts and reasonable inferences drawn therefrom are construed in favor of the non-moving party, here Gary. *Id.* at 537–38. The appellant bears the burden of persuading us summary judgment was erroneous. *Cincinnati Ins. Co. v. Davis*, 860 N.E.2d 915, 922 (Ind.Ct. App.2007).

The moving party bears the burden of making a prima facie showing there are no genuine issues of material fact and the

---

2. In an affidavit, Phyllis stated she was unaware Alvis had been convicted of a felony. In her deposition, Phyllis admitted Alvis had been convicted of "malicious shooting and attempt to kill" in 1952 and that she had become aware of that fact soon after their first marriage in 1965. (Appellant's App. at 84.)

movant is entitled to judgment as a matter of law. *Coutee v. Lafayette Neighborhood Housing Servs., Inc.,* 792 N.E.2d 907, 910 (Ind.Ct.App.2003), *trans. denied* 812 N.E.2d 794 (Ind.2004). Once this burden is met, the opponent may not rest on the pleadings, but must set forth specific facts showing a genuine issue for trial. *Marion County v. State,* 888 N.E.2d 292, 296 (Ind. Ct.App.2008).

### 1. Negligence

The parties rely primarily on *Johnson v. Patterson,* 570 N.E.2d 93 (Ind.Ct.App. 1991), which recognized a cause of action for negligent entrustment of a gun, and *Estate of Heck ex rel. Heck v. Stoffer,* 786 N.E.2d 265 (Ind.2003), reh'g denied, which held a gun owner has a duty to exercise ordinary care in the storage and safekeeping of a gun. Phyllis notes Alvis owned the guns, and argues she cannot be liable for negligently entrusting, storing, or safekeeping the guns because she did not own them. However, the evidence favorable to Gary is that Phyllis purchased the guns for Alvis, and Gary argues that it was negligent to do so. The defendants in *Estate of Heck and Johnson* were gun owners, and nothing in those opinions addressed whether one might be negligent in procuring a gun for another person.

Gary argues negligent purchase of a gun is analogous to negligent entrustment.

> As a general rule, when an instrumentality passes from the control of a person, his responsibilities for injuries inflicted by it ceases. [sic] An exception exists where the instrument is entrusted to one who is incompetent or irresponsible or who lacks the capacity to safely use or operate the instrumentality.

*Johnson,* 570 N.E.2d at 96 (citations omitted). *Johnson* applied the same analysis as cases concerning negligent entrustment of a vehicle:

> In Indiana, the law requires that the owner of an automobile will be liable for the negligent acts of one to whom he entrusts the vehicle only if the owner knows at the time of the entrustment that the person is incompetent, uninstructed in its use or unfamiliar with the dangers of such use. It is insufficient to impose liability where the defendant did not know but could have or should have known of the entrustee's propensity to act in a negligent manner. The elements of negligent entrustment are 1) an entrustment, 2) to an incapacitated person or one who is incapable of using due care, 3) with actual and specific knowledge that the person is incapacitated or incapable of using due care at the time of the entrustment, 4) proximate cause, and 5) damage.

*Id.* at 96–97 (citations omitted).

We conclude the designated evidence does not demonstrate proximate cause. "Foreseeability of injury is regarded as an essential element or fundamental test of proximate cause." *Johnson v. Bender,* 174 Ind.App. 638, 369 N.E.2d 936, 939 (1977). The injury or consequence of the wrongful act must be of a class reasonably foreseeable at the time of the act. *Senco Products, Inc. v. Riley,* 434 N.E.2d 561, 569 (Ind.Ct.App.1982). cf. *Webb v. Jarvis,* 575 N.E.2d 992, 997 (Ind.1991) ("In analyzing the foreseeability component of duty, we focus on whether the person actually harmed was a foreseeable victim and whether the type of harm actually inflicted was reasonably foreseeable."). Phyllis' testimony suggests the guns were purchased before the separation, but the designated evidence does not indicate when Phyllis bought the gun used in the shooting. Gary points to Alvis' intensified dislike of Linda *after* the separation, but that is not something Phyllis could have con-

templated at the time she purchased the gun.

Alvis abused Phyllis throughout their marriages, but the record is devoid of evidence that Phyllis was aware of a threat of violence toward others at the time the gun was purchased. Phyllis testified Alvis threatened to kill her, but did not make threats toward others. Even when he threatened Phyllis, Alvis did not use a gun. Phyllis testified Alvis and Linda "didn't get along," (Appellant's App. at 101), and Alvis would sometimes get "mad" at her daughters. (*Id.* at 86.) However, the only evidence of violence or threats towards Linda was the rape that occurred sometime around 1980, when Linda was a teenager and still living at home. Phyllis testified Alvis had been drinking heavily for several years and she considered him mentally incompetent, but the designated evidence does not reflect he was abusing alcohol or incompetent at the time the gun was purchased.

■ One who purchases a gun is not forever liable for all acts involving the gun, but only for those acts that are foreseeable at the time the gun is purchased. *See Senco Products*, 434 N.E.2d at 569 (injury must be foreseeable at time of allegedly negligent act). We do not know what Phyllis knew when she purchased the gun because Gary designated no evidence as to when the gun was purchased. Therefore, the designated evidence does not establish a genuine issue of material fact as to proximate cause.

Gary's alternative theory of liability is that Phyllis negligently stored or monitored the gun. Phyllis testified she left her house and allowed Alvis to take his personal belongings soon after they separated, and Alvis took the guns then. Gary appears to reject Phyllis' account of how the guns came to be in Alvis' possession, noting Jason's claim that he saw the gun in Phyllis' home within a month of the shooting. Gary does not specify how he believes Alvis gained possession of the gun or how Phyllis was negligent. Phyllis changed her locks a few months after the separation, and thereby had restricted Alvis' access to her home and its contents. *Cf. Estate of Heck*, 786 N.E.2d at 269–70 (finding question of fact regarding whether parents exercised due care in storing handgun when they allowed son who was evading arrest to have unfettered access to their home). Gary's theories of liability are not supported by the designated evidence, even when viewed in the light favorable to him; therefore, the trial court did not err by granting summary judgment.

### 2. *Nonprobate Transfers*

■ During Alvis' life, Phyllis contributed money to some investment accounts, some of which were in Alvis' name or held jointly between the two of them. These accounts were not part of Alvis' estate; they passed to Phyllis outside of probate. Therefore, Phyllis became the sole owner of these accounts after Alvis' death. Gary argues these accounts should be used to satisfy any judgment against Alvis, to the extent his estate is insufficient to do so.

Phyllis argues the trial court correctly limited her liability for claims on Alvis' estate to the extent that he contributed to the accounts that were transferred to her outside of probate. She relies on Ind.Code § 32–17–13–2, which provides:

(a) Except as otherwise provided by statute, a transferee of a nonprobate transfer is subject to liability to a decedent's probate estate for:

(1) allowed claims against the decedent's probate estate; and

(2) statutory allowances to the decedent's spouse and children; to the extent the decedent's probate estate is

insufficient to satisfy those claims and allowances.

(b) The liability of the nonprobate transferee may not exceed the value of nonprobate transfers received or controlled by the nonprobate transferee.

(c) The liability of the nonprobate transferee does not include the net contributions of the nonprobate transferee.

Gary argues the trial court should have distinguished between joint accounts and P.O.D. accounts and that P.O.D. accounts should be subject to claims on Alvis' estate. Gary relies on Ind.Code § 32–17–11–17, which provides in relevant part:

(a) Unless there is clear and convincing evidence of a different intent, during the lifetime of all parties, a joint account belongs to the parties in proportion to the net contributions by each party to the sums on deposit.

(b) A P.O.D. account belongs to the original payee during the original payee's lifetime and not to the P.O.D. payee or payees. If at least two (2) parties are named as original payees, subsection (a) governs the rights of the parties during their lifetimes.

Gary asserts, without citation to authority, "Presumptively and logically, I.C. 32–17–13–2(c) exists to protect a transferee's funds already owned by the transferee prior to the death of the other party to the account." (Appellant's Br. at 17.) Therefore, he argues, because the funds in P.O.D. accounts did not belong to Phyllis prior to Alvis' death, those accounts should not fall within the protection of Ind.Code § 32–17–13–2(c).

Chapter 32–17–11 is titled "Multiple Party Accounts," and chapter 32–17–13 is titled "Liability of Nonprobate Transferees for Creditor Claims and Statutory Allowances." These two chapters are harmonized by Ind.Code § 32–17–11–21.1, which provides, "The liability of a surviving party, P.O.D. payee, or beneficiary for creditor claims and statutory allowances is determined under IC 32–17–13." Ind.Code § 32–17–11–17 is based on § 6–103 of the Uniform Probate Code, and the official comment to that section states, "It is important to note that the section is limited to describe ownership of an account while the original parties are alive." Ind.Code § 32–17–11–17, cmt. Although joint accounts and P.O.D. accounts are governed by different rules during the parties' lifetimes, the liability of both surviving parties and P.O.D. parties is determined by chapter 32–17–13, and that chapter makes no distinction between the two. Ind.Code § 32–17–13–2(c) is the provision that most specifically addresses the issue of Phyllis' liability, and the trial court did not err in holding Phyllis' contributions to the disputed accounts are not subject to claims on Alvis' estate. *See Nordman v. North Manchester Foundry, Inc.,* 810 N.E.2d 1071, 1074 (Ind.Ct.App.2004) (when two conflicting statutory provision appear controlling, the more specific provision applies).

Affirmed.

NAJAM, J., and ROBB, J., concur.